99. Carpenter did not notify the seller's counsel of the assignment.

100. Upon information and belief, Carpenter did not notify the seller's counsel that the escrow deposit being held by sellers' counsel was now the property of Eiffel.

101. The balance of the $200,000 was to be paid in certified funds. The first payment of $100,000 was due within sixty (60) days of conceptual approval of the subdivision by the planning board. The second payment of $100,000 was due within sixty (60) days of preliminary approval of the subdivision by the planning board or upon final approval, whichever was first.

102. The Churchland Assignment further provided that AACK was to apply for a 120-lot subdivision and that in the event it was unable to obtain final approval for at least a 60-lot subdivision then Eiffel had the right: (a) to declare the agreement null and void and AACK was required to return all of Eiffel's deposits immediately upon request or (b) to proceed to closing without such approval.

## THE LAUREN TICE PROPERTY

103. By contract dated January 13, 2006 ("Lauren Tice Contract"), Norman Heese, as seller, entered into a contract of sale with Counterclaim-Defendant Fairview, as purchaser, for the purchase of 80 acres of land on Lauren Tice Road in

the Town of Saugerties, County of Ulster ("Lauren Tice Property"). The purchase price of the property was $450,000.

104. An initial earnest money deposit in the amount of $5,000 was to be paid and an additional $20,000 down payment was to be made upon the signing of the Lauren Tice Contract. The $25,000 down payment was to be held in escrow by George Redder, Esq., attorney for seller. The balance of $425,000 was to be paid in cash or bank check at closing. Upon information and belief, Fairview paid the down payment.

105. Fairview was represented by Counterclaim-Defendant Carpenter.

106. The Lauren Tice Contract was conditioned upon the approval of a subdivision for 17 lots.

## THE LAUREN TICE ASSIGNMENT

107. On or about the same time Eiffel was negotiating the terms of the Churchland Assignment, Lore mentioned another "lucrative" property which he had under contract.

108. Having developed a trust relationship with Lore as a result of its dealings with him on the Churchland Assignment, Eiffel was interested in learning about any additional properties which might be available.

109. In or about September of 2006, Lore represented to Eiffel that it maintained a contract for the Lauren Tice Property which had already obtained conceptual approval for 16 lots.

110. Lore represented to Eiffel that he was advised by his engineer on the project that he would be able to obtain an approval for a 25-lot subdivision on the Lauren Tice Property.

111. Carpenter submitted two letters to Eiffel representing that Fairview was in good standing and that the contract was fully assignable.

112. Fairview represented that it had $107,500 in escrow between the Lauren Tice and Clermont deals.

113. Based on these representations, Eiffel entered into an assignment agreement with Fairview ("Lauren Tice Assignment"), dated September 27, 2006.

114. The Lauren Tice Assignment was executed on behalf of Fairview by both Lore and Ackert Jr.

115. Pursuant to the Lauren Tice Assignment, Eiffel was to pay to Fairview the sum of $150,000 and the $25,000 Fairview had already paid in escrow to the Seller became the property of Eiffel.

116. The $150,000 was payable as follows: $50,000 in certified funds to Carpenter's escrow account upon the return of a) the executed assignment by the parties; b) a copy of the contract with all addendums and riders with a copy of the

16

escrow deposit check; c) a certification letter from Carpenter confirming that Fairview has not assigned or encumbered its title in the contract; and d) that Fairview is incorporated and in good standing.

117. The balance of $100,000 was to be paid in certified funds to Carpenter to be disbursed to Fairview. The first $50,000 was due within thirty (30) days of sketch approval of the subdivision by the planning board and the second payment was to be made within thirty (30) days of preliminary approval of the subdivision by the planning board.

118. Pursuant to the terms of the Lauren Tice Assignment, Fairview retained full responsibility for doing all acts necessary to obtain subdivision approval for the Lauren Tice Property. The Lauren Tice Assignment contemplated that Fairview would apply for the subdivision with the town, retain all engineers, surveyors, etc. necessary to pursue the approval, and ultimately obtain final approval from the Town for a 28-lot subdivision.

119. Carpenter did not notify the sellers's counsel of the assignment.

120. Carpenter did not notify the sellers's counsel that the escrow deposit being held by seller's counsel was now the property of Eiffel.

121. Fairview agreed to apply for a 28-lot subdivision.

122. In the event that Fairview could not obtain final approval for at least a 17-lot subdivision Eiffel could declare the agreement null and void and Fairview and Carpenter must return all deposits immediately to Eiffel.

123. Upon information and belief, no such approval could ever have been obtained.

## THE CLERMONT CONTRACT

124. On or about May 26, 2006, Alicia Turek Collins, as seller, entered into a contract (the "Clermont Contract") with Horizon Real Property Development LLC, as purchaser, for the purchase of vacant property located in both the Town of Claremont, and the Town of Livingston, County of Columbia, consisting of approximately 150 acres of land (the "Clermont Property").

125. Pursuant to the Clermont Contract, the purchase price was $1,650,000.

126. The Clermont Contract proposed that the lot be divided into a 30-lot subdivision.

127. Upon information and belief, a down payment of $414,150 was made by Horizon to be held in escrow with the balance at closing to be paid in the amount of $1,235,850.

128. In the event that the Horizon was unable to obtain approval for at least a 30-lot subdivision, Horizon would have the option of declaring the contract null and void and receiving the return of its down payment.

129. Upon information and belief, no such approval could ever have been obtained.

## THE CLERMONT ASSIGNMENT

130. The same time Lore told Eiffel about the Lauren Tice Property, Lore represented that he was advised by his engineer that he could obtain a minimum of a 42-lot subdivision on the Clermont Property, which he maintained under contract as Horizon.

131. Horizon provided Eiffel with two maps representing that they could obtain a subdivision of 42 lots.

132. Lore represented that it had $107,500 in escrow between the Lauren Tice and Clermont Contracts.

133. Based on these representations, Eiffel entered into an assignment agreement with Horizon, dated September 27, 2006 (the "Clermont Assignment").

134. Pursuant to the terms of the Clermont Assignment, Horizon retained full responsibility for doing all acts necessary to obtain subdivision approval for the Clermont Property. The Clermont Assignment contemplated that Horizon would apply for the subdivision with the town, retain all engineers, surveyors, etc. necessary to pursue the approval, and ultimately obtain final approval from the Town for a 42-lot subdivision.

135. Carpenter did not notify the sellers's counsel of the assignment.

136. Carpenter did not notify the sellers's counsel that the escrow deposit being held by seller's counsel was now the property of Eiffel.

137. Based on these representations, Eiffel remitted $100,000 to be held in Carpenter's escrow account.

138. The Clermont Assignment was executed by Lore and Ackert Jr. on behalf of Horizon.

139. Pursuant to the Clermont Assignment, Eiffel wired $100,000 to be held in escrow by Carpenter.

140. Pursuant to the Clermont Assignment, Eiffel was to pay Horizon the sum of $300,000 in total. The sum of $150,000 was to be paid in certified funds to Carpenter's escrow account upon a) the return of the executed assignment by the parties; b) a copy of the contract; and c) a certification letter from Carpenter that Horizon was incorporated and in good standing.

141. The balance of $150,000 was to be paid in certified funds. The first payment of $75,000 due within 30 days of receipt of sketch approval and the second payment of $75,000 due within 60 days of receipt of preliminary approval of the subdivision or receipt of all final approvals.

142. Horizon agreed to apply for an approximately 42-lot subdivision.

143. In the event that Horizon was not able to obtain final approval for at least a 30-lot subdivision then Eiffel could declare the agreement null and void and Eiffel would be entitled to the return of all of its deposits.

144. Upon information and belief, no such approval could ever have been obtained.

## COUNTERCLAIM-DEFENDANTS' CONDUCT FOLLOWING THE EXECUTION OF THE ASSIGNMENTS

145. Each of the assignment agreements required the Counterclaim-Defendants Fairview, AACK and Horizon, respectively, to keep Eiffel informed as to the status of all applications made for approval. The agreements further provided that Eiffel would receive copies of all documents submitted to any governmental agencies or any documents received by the Counterclaim-Defendants regarding subdivision approval.

146. Additionally, the assignment agreements provided that all documents for the approval process were required to be approved by Eiffel prior to submission.

147. Fairview, AACK and Horizon had an obligation under the assignment agreements to at all times act in good faith and to further the purposes of the assignments.

148. Shortly after the three assignments were executed, the lack of cooperation by the Counterclaim-Defendants and their failure to abide by the terms of the assignments became evident.

149. Beginning in or about September 2006, Eiffel made numerous requests, in writing and over the telephone, requesting that Carpenter provide it with documentation confirming that $181,200 was being held in escrow for the Churchland Contracts.

150. Eiffel's numerous requests went ignored by Carpenter however, who repeatedly failed to supply her with any documentation.

151. In the following months, Eiffel made several requests of the Counterclaim Defendants for information regarding the status of the three assignments and for documentation evidencing the progressing approval process.

152. A majority of these demands went ignored by the Counterclaim-Defendants.

153. In a letter dated November 27, 2006, Ackert Jr., writing on behalf of Superior, represented to Eiffel that Sketch Approval had been obtained for the Lauren Tice Property at a Saugerties Town Board Meeting the night before.

154. In that letter, Ackert Jr. requested that Eiffel remit a check for $50,000 as per the terms of the Lauren Tice Assignment.

155. Based on Ackert Jr.'s representation, Eiffel remitted payment of $50,000 to Carpenter.

156. Three days later, on or about November 30, 2006, Ackert Jr., on behalf of Superior, represented to Eiffel that "the Town of Saugerties has given the go ahead on the Churchland Road property for 104 building lots." The letter also requested that Eiffel remit $100,000 as per the terms of the Churchland Assignment.

157. This representation was false.

158. Eiffel requested Counterclaim Defendants provide Eiffel with signed written receipts of the sketch approvals for Lauren Tice and Churchland Properties as required by the terms of the assignments.

159. Counterclaim Defendants failed to provide Eiffel with the written receipts of sketch approval for either of the properties.

160. On or about March of 2007, Counterclaim-Defendants faxed a letter to Eiffel which purported to be a letter from William Creen of the Saugerties Town Board stating that the Lauren Tice Property had received sketch approval.

161. Upon information and belief, this letter was a forgery created by the Counterclaim-Defendants.

162. Despite numerous demands, Counterclaim-Defendants never provided Eiffel with written receipts of the sketch approval.

163. Upon information and belief, the Lauren Tice Property never obtained sketch approval from the Town of Saugerties.

164. Upon information and belief, the Churchland Property never obtained sketch approval from the Town of Saugerties.

165. In addition to the $350,000.00 the Counterclaim-Plaintiff paid to Counterclaim-Defendants pursuant to the terms of the assignments, Eiffel paid an additional $26,195.99 to Carpenter, purportedly to pay for the costs for aerial photos for the properties, maps and tax reimbursements.

166. After much frustration over the failure of the Counterclaim-Defendants to diligently proceed pursuant to the terms of the assignments, and to provide accurate information to it, Eiffel hired its own engineers to investigate the properties and proceed with the subdivision process.

167. Eiffel hired Leo J. Carroll, P.E., L.S. & Associates, a company specializing in surveying, engineering and land planning, and Tonche Timber, a professional forestry and nature resource consultant company (collectively the "Engineers"), to perform an analysis of the Churchland, Lauren Tice and Clermont properties.

168. Upon review of the Churchland, Lauren Tice and Clermont Properties, the Engineers determined that the subdivision plans contemplated in each of the three assignments were not feasible.

24

169. The Engineers determined that each of the three properties contained wetlands, in addition to other zoning issues, that made lot subdivisions as contemplated by the assignments impossible to obtain.

170. Eiffel paid the Engineers it hired in excess of $6,400 for their work at the Churchland, Lauren Tice and Clermont properties

171. Upon information and belief, the Counterclaim-Defendants knew that the subdivision projects contemplated in the Churchland, Lauren Tice and Clermont Assignments could not be accomplished as set forth therein, at the time Eiffel entered the assignments in August and September of 2006.

172. Upon information and belief, the Counterclaim-Defendants knew that it would be impossible to obtain a subdivision for the number of lots set forth in each of the assignment agreements.

173. Upon information and belief, the Counterclaim-Defendants knew that wetlands existed on the properties which would seriously limit, if not completely destroy, the ability to develop the properties as contemplated by the assignments.

174. Counterclaim Defendants deliberately concealed all of this information from Eiffel.

175. Upon information and belief, the Counterclaim-Defendants knew the conditions and limitations on these properties well and were aware that both