UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

KIMBERLEY A. CARPENTER, ARTHUR ACKERT, JR., ARTHUR ACKERT, SR., DENNIS LORE, and SUPERIOR WALLS OF THE HUDSON VALLEY, INC.,

Plaintiffs,

- against -

MARIE PUPKE and EIFFEL INVESTMENT GROUP AND ASSOCIATES, LLC,

Defendants.

Civil Action No. 07-civ-5689 (UA/LMS)

-------------------------------------------------------------X

EIFFEL INVESTMENT GROUP AND ASSOCIATES, LLC,

Third-Party Plaintiff,

- against -

**THIRD-PARTY COMPLAINT**

AACK LAND DEVELOPMENT, LLC, FAIRVIEW BLOCK AND SUPPLY CORP., and HORIZON REAL PROPERTY DEVELOPMENT, LLC,

Third-Party Defendants.

-------------------------------------------------------------X

Third-Party Plaintiff Eiffel Investment Group and Associates LLC, by its attorneys, Lazer, Aptheker, Rosella & Yedid, P.C., alleges as follows:

1. Third-Party Eiffel Investment Group and Associates LLC ("Eiffel"), is a Florida limited liability company with an address at 8266 Sawpine Road, Delray Beach, Florida.

2. Eiffel is in the business of real estate sales and development.

3. Upon information and belief, Counterclaim-Defendant Kimberly A. Carpenter ("Carpenter") is an individual residing at 15 Mereland Road, New Rochelle, New York.

2

4.      Upon information and belief, Carpenter is a member of the New York State bar in good standing.

5.      Upon information and belief, Counterclaim-Defendant Arthur Acker Jr. ("Acker Jr.") is an individual residing at 13 Kimlin Court, Poughkeepsie, New York.

6.      Upon information and belief, Counterclaim-Defendant Dennis Lore ("Lore") is an individual residing at 136 Moonlight Drive, Stormville, New York.

7.      Upon information and belief, Counterclaim-Defendant Superior Walls of the Hudson Valley, Inc. ("Superior") is a New York corporation with an office at 68 Violet Avenue, Poughkeepsie, New York.

8.      Upon information and belief, Third-Party Defendant AACK Land Development, LLC ("AACK") is a New York limited liability company with an office at 68 Violet Avenue, Poughkeepsie, New York.

9.      Upon information and belief, Third-Party Defendant Fairview Block and Supply Corp. ("Fairview") is currently an inactive New York corporation that previously maintained an office at 68 Violet Avenue, Poughkeepsie, New York.

10.     Upon information and belief, Third-Party Defendant Horizon Real Property Development LLC ("Horizon") is a New York limited liability company with an office at 68 Violet Avenue, Poughkeepsie, New York.

11.     Upon information and belief, Counterclaim-Defendants Lore and Acker Jr. were and continue to be the principals of Horizon, Fairview, AACK and Superior.

12. Upon information and belief, Counterclaim-Defendants Lore and Acker Jr. used these companies interchangeably to conduct business and in an attempt to insulate themselves from personal liability.

13. Upon information and belief, Lore and Acker Jr. acted under the guise of Horizon, Fairview, AACK and Superior to further their scheme to defraud Eiffel.

14. This Court has jurisdiction over this matter based on diversity of citizenship and amount in controversy under 28 U.S.C. Section §1332.

## THE CHURCHLAND PROPERTIES

### Contract for Parcel I

15. In or about June 12, 2006, Independence Community Bank as custodian for John R. Addirizzo, MD IRA and for Amaticia Addirizzio, IRA of Staten Island, New York, as sellers, entered into a contract with Third-Party Defendant AACK, as purchaser, for the purchase of 100 acres of land in the Town of Saugerties, County of Ulster ("Churchland Contract I").

16. AACK was represented in the transaction by Counterclaim-Defendant Carpenter.

17. Pursuant to the June 12, 2006 contract, the purchase price of Parcel I was $1,200,000. Upon the signing of the June 12, 2006 contract by seller's attorney, $120,000 was to be held in escrow by the law firm of Maynard, O'Connor, Smith & Catalinotto, LLP.

4

Upon information and belief, Third-Party Defendant AACK deposited this sum in accordance with the contract.

18.   The purchase price of the parcel was to be adjusted if, upon a survey, the acreage was found to be more or less than 100 acres.

19.   Pursuant to the June 12, 2006 contract, AACK agreed to pay the seller $29,200 upon the sale of each lot.

20.   The Churchland Contract I was conditioned upon purchaser obtaining approval from the Town of Saugerties for a 40-lot subdivision for the 100-acre parcel by December 1, 2006.

21.   No such approval was obtained by that date.

22.   Upon information and belief, no such approval could ever have been obtained.

23.   Purchaser had a period of 90 days from receipt of an executed copy of the contract to perform inspections necessary to determine if an application for at least a 40-lot subdivision was feasible.  If it was determined not to be feasible purchaser would have the right to return of all amounts paid under the contract.

24.   In the event the purchaser was unable to obtain approval of at least a 40-lot subdivision, purchaser would have the option of declaring the contract null and void and receiving a return of its down payment or proceeding to closing without such approval.

**Contract for Parcel II**

25.    On or about June 12, 2006, Independence Community Bank as custodian for John R. Addrizzio, MD IRA and Amaticia Addrizzio, IRA, as sellers, entered into a contract with AACK, as purchaser, in the amount of $612,000 for purchase of a second property in the Town of Saugerties, County of Ulster consisting of plus/minus 51 acres ("Churchland Contract II").

26.    AACK was represented in the transaction by Counterclaim-Defendant Carpenter. Churchland Contract II provided that upon signing the contract, $61,200 was to be held in escrow by seller's attorney. Upon information and belief, Third-Party Defendant AACK deposited this sum in accordance with the contract.

27.    The contract was conditioned upon the purchaser obtaining approval from the Town of Saugerties for a 20-lot subdivision for the parcel for a 100 acre parcel by December 1, 2006.

28.    No such approval was obtained by that date.

29.    Upon information and belief, no such approval could ever have been obtained.

30.    Purchaser had a period of 90 days from receipt of an executed copy of the contract to perform inspections necessary to determine if an application for at least a 20-lot subdivision was feasible. If it was determined not to be feasible purchaser would have the right to return of all amounts paid under the contract.

5

9

31.     In the event the purchaser was unable to obtain approval of at least a 20-lot
subdivision, purchaser would have the option of declaring the contract null and void and
receiving a return of its down payment or proceeding to closing without such approval.

**THE CHURCHLAND ASSIGNMENT**

32.     In or about July of 2006, Eiffel, a Florida company, decided to look for land to
develop in upstate New York.

33.     Having little knowledge of the New York real estate market, Mark Pupke, a
principal of Eiffel, made arrangements to meet with real estate agent Lore, who had been
recommended by a friend.

34.     On or about July 21, 2006, Mr. Pupke met with Lore to learn more about
particular properties that Lore had under contract.

35.     During their meeting, Lore represented to Eiffel that his engineers had
inspected both Parcel I and Parcel II (together the "Churchland Properties") and that he could
expect to obtain a total a 104 lots on the properties.

36.     During the meeting, Lore expressed how lucrative each of the properties were
and stated that he and his partners, Counterclaim-Defendant Ackert Jr. and Arthur Ackert Sr.
would develop the properties themselves had they not been involved in too many other
projects.

37.     Lore represented to Eiffel that it could resell each lot for approximately
$100,000.

38.    Lore also represented that if Eiffel were to develop the property after subdivision approval was obtained, Eiffel could "clear" five million dollars ($5,000,000.00) with the purchase of these lots.

39.    In addition, Lore represented that he and his partners had already disbursed $181,200 into the seller's escrow account in accordance with the terms of the Churchland Contracts.

40.    Lore told Mr. Pupke that it would take under one year for to receive full approvals from the Town of Saugerties to allow the subdivision of this property.

41.    Lore represented to Eiffel that if Eiffel took over the contracts Lore and Ackert Jr. would still remain fully responsible for completing the subdivision approval process.

42.    During the course of this meeting, Lore represented to Mr. Pupke that all money paid by Eiffel would be held in escrow by Carpenter pending subdivision approval.

43.    During the course of these discussions Lore failed to advise Eiffel that his partner, Ackert, Jr., was Carpenter's sister.

44.    On or about August 14, 2006, based on Lore's representations, Eiffel entered into an assignment agreement ("Churchland Assignment"), with AACK, an entity in which Lore, Ackert Jr. and Ackert Sr. were partners, for the assignment of AACK's interest in the Churchland Contracts.

45.    AACK was represented by Carpenter.

8

46.    Lore represented to Eiffel that the transaction would run more smoothly if the parties did not retain counsel.

47.    Based on the foregoing, Eiffel did not retain counsel to represent it in the transaction.

48.    Pursuant to the terms of the Churchland Assignment, Eiffel was to pay AACK the sum of $300,000 and the $181,200 AACK had already paid in escrow to the seller became the property of Eiffel.

49.    Pursuant to the terms of the Churchland Assignment, AACK retained full responsibility for doing all acts necessary to obtain subdivision approval for the Churchland Properties. The Churchland Assignment contemplated that AACK would apply for the subdivision with the town, retain all engineers, surveyors, etc. necessary to pursue the approval, and ultimately obtain final approval from the Town for a 120-lot subdivision.

50.    Upon the execution of the assignment Eiffel paid $100,000 in certified funds to Carpenter's escrow account to be disbursed to AACK upon the receipt of a certification letter from the purchaser's attorney certifying the validity of the contract and that the contract is fully assignable with the seller's permission.

51.    Carpenter did not notify the seller's counsel of the assignment.

52.    Upon information and belief, Carpenter did not notify the seller's counsel that the escrow deposit being held by sellers' counsel was now the property of Eiffel.

6

53.     The balance of the $200,000 was to be paid in certified funds. The first payment of $100,000 was due within sixty (60) days of conceptual approval of the subdivision by the planning board. The second payment of $100,000 was due within sixty (60) days of preliminary approval of the subdivision by the planning board or upon final approval, whichever was first.

54.     The Churchland Assignment further provided that AACK was to apply for a 120-lot subdivision and that in the event it was unable to obtain final approval for at least a 60-lot subdivision then Eiffel had the right: (a) to declare the agreement null and void and AACK was required to return all of Eiffel's deposits immediately upon request or (b) to proceed to closing without such approval.

## THE LAUREN TICE PROPERTY

55.     By contract dated January 13, 2006 ("Lauren Tice Contract"), Norman Heese, as seller, entered into a contract of sale with Third-Party Defendant Fairview, as purchaser, for the purchase of 80 acres of land on Lauren Tice Road in the Town of Saugerties, County of Ulster ("Lauren Tice Property"). The purchase price of the property was $450,000.

56.     An initial earnest money deposit in the amount of $5,000 was to be paid and an additional $20,000 down payment was to be made upon the signing of the Lauren Tice Contract. The $25,000 down payment was to be held in escrow by George Redder, Esq., attorney for seller. The balance of $425,000 was to be paid in cash or bank check at closing.

Upon information and belief, Fairview paid the down payment.

57.    Fairview was represented by Counterclaim-Defendant Carpenter.

58.    The Lauren Tice Contract was conditioned upon the approval of a subdivision for 17 lots.

**THE LAUREN TICE ASSIGNMENT**

59.    On or about the same time Eiffel was negotiating the terms of the Churchland Assignment, Lore mentioned another "lucrative" property which he had under contract.

60.    Having developed a trust relationship with Lore as a result of its dealings with him on the Churchland Assignment, Eiffel was interested in learning about any additional properties which might be available.

61.    In or about September of 2006, Lore represented to Eiffel that it maintained a contract for the Lauren Tice Property which had already obtained conceptual approval for 16 lots.

62.    Lore represented to Eiffel that he was advised by his engineer on the project that he would be able to obtain an approval for a 25-lot subdivision on the Lauren Tice Property.

63.    Carpenter submitted two letters to Eiffel representing that Fairview was in good standing and that the contract was fully assignable.

64.    Fairview represented that it had $107,500 in escrow between the Lauren Tice and Clermont deals.

11

65.    Based on these representations, Eiffel entered into an assignment agreement with Fairview ("Lauren Tice Assignment"), dated September 27, 2006.

66.    The Lauren Tice Assignment was executed on behalf of Fairview by both Lore and Ackert Jr.

67.    Pursuant to the Lauren Tice Assignment, Eiffel was to pay to Fairview the sum of $150,000 and the $25,000 Fairview had already paid in escrow to the Seller became the property of Eiffel.

68.    The $150,000 was payable as follows: $50,000 in certified funds to Carpenter's escrow account upon the return of a) the executed assignment by the parties; b) a copy of the contract with all addendums and riders with a copy of the escrow deposit check; c) a certification letter from Carpenter confirming that Fairview has not assigned or encumbered its title in the contract; and d) that Fairview is incorporated and in good standing.

69.    The balance of $100,000 was to be paid in certified funds to Carpenter to be disbursed to Fairview.  The first $50,000 was due within thirty (30) days of sketch approval of the subdivision by the planning board and the second payment was to be made within thirty (30) days of preliminary approval of the subdivision by the planning board.

70.    Pursuant to the terms of the Lauren Tice Assignment, Fairview retained full responsibility for doing all acts necessary to obtain subdivision approval for the Lauren Tice Property.  The Lauren Tice Assignment contemplated that Fairview would apply for the

subdivision with the town, retain all engineers, surveyors, etc. necessary to pursue the

approval, and ultimately obtain final approval from the Town for a 28-lot subdivision.

71.     Carpenter did not notify the seller's counsel of the assignment.

72.     Carpenter did not notify the seller's counsel that the escrow deposit being held

by seller's counsel was now the property of Eiffel.

73.     Fairview agreed to apply for a 28-lot subdivision.

74.     In the event that Fairview could not obtain final approval for at least a 17-lot

subdivision Eiffel could declare the agreement null and void and Fairview and Carpenter

must return all deposits immediately to Eiffel.

75.     Upon information and belief, no such approval could ever have been obtained.

**THE CLERMONT CONTRACT**

76.     On or about May 26, 2006, Alicia Turek Collins, as seller, entered into a

contract (the "Clermont Contract") with Horizon Real Property Development LLC, as

purchaser, for the purchase of vacant property located in both the Town of Claremont, and

the Town of Livingston, County of Columbia, consisting of approximately 150 acres of land

(the "Clermont Property").

77.     Pursuant to the Clermont Contract, the purchase price was $1,650,000.

78.     The Clermont Contract proposed that the lot be divided into a 30-lot

subdivision.

12

79.    Upon information and belief, a down payment of $414,150 was made by Horizon to be held in escrow with the balance at closing to be paid in the amount of $1,235,850.

80.    In the event that the Horizon was unable to obtain approval for at least a 30-lot subdivision, Horizon would have the option of declaring the contract null and void and receiving the return of its down payment.

81.    Upon information and belief, no such approval could ever have been obtained.

## THE CLERMONT ASSIGNMENT

82.    The same time Lore told Eiffel about the Lauren Tice Property, Lore represented that he was advised by his engineer that he could obtain a minimum of a 42-lot subdivision on the Clermont Property, which he maintained under contract as Horizon.

83.    Horizon provided Eiffel with two maps representing that they could obtain a subdivision of 42 lots.

84.    Lore represented that it had $107,500 in escrow between the Lauren Tice and Clermont Contracts.

85.    Based on these representations, Eiffel entered into an assignment agreement with Horizon, dated September 27, 2006 (the "Clermont Assignment").

86.    Pursuant to the terms of the Clermont Assignment, Horizon retained full responsibility for doing all acts necessary to obtain subdivision approval for the Clermont Property. The Clermont Assignment contemplated that Horizon would apply for the

14

subdivision with the town, retain all engineers, surveyors, etc. necessary to pursue the approval, and ultimately obtain final approval from the Town for a 42-lot subdivision.

87.     Carpenter did not notify the seller's counsel of the assignment.

88.     Carpenter did not notify the seller's counsel that the escrow deposit being held by seller's counsel was now the property of Eiffel.

89.     Based on these representations, Eiffel remitted $100,000 to be held in Carpenter's escrow account.

90.     The Clermont Assignment was executed by Lore and Ackert Jr. on behalf of Horizon.

91.     Pursuant to the Clermont Assignment, Eiffel wired $100,000 to be held in escrow by Carpenter.

92.     Pursuant to the Clermont Assignment, Eiffel was to pay Horizon the sum of $300,000 in total.  The sum of $150,000 was to be paid in certified funds to Carpenter's escrow account upon a) the return of the executed assignment by the parties; b) a copy of the contract; and c) a certification letter from Carpenter that Horizon was incorporated and in good standing.

93.     The balance of $150,000 was to be paid in certified funds. The first payment of $75,000 due within 30 days of receipt of sketch approval and the second payment of $75,000 due within 60 days of receipt of preliminary approval of the subdivision or receipt of all final approvals.

94.    Horizon agreed to apply for an approximately 42-lot subdivision.

95.    In the event that Horizon was not able to obtain final approval for at least a 30-lot subdivision then Eiffel could declare the agreement null and void and Eiffel would be entitled to the return of all of its deposits.

96.    Upon information and belief, no such approval could ever have been obtained.

**THIRD-PARTY DEFENDANTS' CONDUCT FOLLOWING THE EXECUTION OF THE ASSIGNMENTS**

97.    Each of the assignment agreements required the Third-Party Defendants Fairview, AACK and Horizon, respectively, to keep Eiffel informed as to the status of all applications made for approval. The agreements further provided that Eiffel would receive copies of all documents submitted to any governmental agencies or any documents received by the Third-Party Defendants regarding subdivision approval.

98.    Additionally, the assignment agreements provided that all documents for the approval process were required to be approved by Eiffel prior to submission.

99.    Fairview, AACK and Horizon had an obligation under the assignment agreements to at all times act in good faith and to further the purposes of the assignments.

100.    Shortly after the three assignments were executed, the lack of cooperation by the Third-Party Defendants and their failure to abide by the terms of the assignments became evident.

15

16

101.   Beginning in or about September 2006, Eiffel made numerous requests, in writing and over the telephone, requesting that Carpenter provide it with documentation confirming that $181,200 was being held in escrow for the Churchland Contracts.

102.   Eiffel's numerous requests went ignored by Carpenter however, who repeatedly failed to supply her with any documentation.

103.   In the following months, Eiffel made several requests of the Third-Party Defendants for information regarding the status of the three assignments and for documentation evidencing the progressing approval process.

104.   A majority of these demands went ignored by the Third-Party Defendants.

105.   In a letter dated November 27, 2006, Acker Jr., writing on behalf of Superior, represented to Eiffel that Sketch Approval had been obtained for the Lauren Tice Property at a Saugerties Town Board Meeting the night before.

106.   In that letter, Acker Jr. requested that Eiffel remit a check for $50,000 as per the terms of the Lauren Tice Assignment.

107.   Based on Acker Jr.'s representation, Eiffel remitted payment of $50,000 to Carpenter.

108.   Three days later, on or about November 30, 2006, Acker Jr., on behalf of Superior, represented to Eiffel that "the Town of Saugerties has given the go ahead on the Churchland Road property for 104 building lots." The letter also requested that Eiffel remit $100,000 as per the terms of the Churchland Assignment.

17

109.   This representation was false.

110.   Eiffel requested Third-Party Defendants provide Eiffel with signed written receipts of the sketch approvals for Lauren Tice and Churchland Properties as required by the terms of the assignments.

111.   Third-Party Defendants failed to provide Eiffel with the written receipts of sketch approval for either of the properties.

112.   On or about March of 2007, Third-Party Defendants faxed a letter to Eiffel which purported to be a letter from William Creen of the Saugerties Town Board stating that the Lauren Tice Property had received sketch approval.

113.   Upon information and belief, this letter was a forgery created by the Third-Party Defendants.

114.   Despite numerous demands, Third-Party Defendants never provided Eiffel with written receipts of the sketch approval.

115.   Upon information and belief, the Lauren Tice Property never obtained sketch approval from the Town of Saugerties.

116.   Upon information and belief, the Churchland Property never obtained sketch approval from the Town of Saugerties.

117.   In addition to the $350,000.00 the Eiffel paid to Third-Party Defendants pursuant to the terms of the assignments, Eiffel paid an additional $26,195.99 to Carpenter,

18

purportedly to pay for the costs for aerial photos for the properties, maps and tax reimbursements.

118.    After much frustration over the failure of the Third-Party Defendants to diligently proceed pursuant to the terms of the assignments, and to provide accurate information to it, Eiffel hired its own engineers to investigate the properties and proceed with the subdivision process.

119.    Eiffel hired Leo J. Carroll, P.E., L.S. & Associates, a company specializing in surveying, engineering and land planning, and Tonche Timber, a professional forestry and nature resource consultant company (collectively the "Engineers"), to perform an analysis of the Churchland, Lauren Tice and Clermont properties.

120.    Upon review of the Churchland, Lauren Tice and Clermont Properties, the Engineers determined that the subdivision plans contemplated in each of the three assignments were not feasible.

121.    The Engineers determined that each of the three properties contained wetlands, in addition to other zoning issues, that made lot subdivisions as contemplated by the assignments impossible to obtain.

122.    Eiffel paid the Engineers it hired in excess of $6,400 for their work at the Churchland, Lauren Tice and Clermont properties

123.    Upon information and belief, the Third-Party Defendants knew that the subdivision projects contemplated in the Churchland, Lauren Tice and Clermont

19

Assignments could not be accomplished as set forth therein, at the time Eiffel entered the assignments in August and September of 2006.

124.    Upon information and belief, the Third-Party Defendants knew that it would be impossible to obtain a subdivision for the number of lots set forth in each of the assignment agreements.

125.    Upon information and belief, the Third-Party Defendants knew that wetlands existed on the properties which would seriously limit, if not completely destroy, the ability to develop the properties as contemplated by the assignments.

126.    Third-Party Defendants deliberately concealed all of this information from Eiffel.

127.    Upon information and belief, the Third-Party Defendants knew the conditions and limitations on these properties well and were aware that both preliminary and final approvals for the subdivisions could never be obtained pursuant to the terms of the assignment agreements.

128.    Based on the foregoing, Eiffel was entitled to cancel the three assignment agreements and obtain a full refund of its money.

129.    In a letter dated April 30, 2007, subsequent to Eiffel's discovery of the total unfeasibility of the subdivision projects, Eiffel notified Lore of its intent to void the Churchland and Lauren Tice Assignments and demanded a full refund of the $250,000.00 it had deposited with Carpenter pursuant to those assignments.

130.    To date, the Third-Party Defendants have failed and refused to refund any of Eiffel's money.

131.    Additionally, they have also thwarted the return of escrow from the original sellers' attorneys, which has belonged to Eiffel since the time the assignments were executed.

## FIRST CLAIM AGAINST ALL
## THIRD-PARTY DEFENDANTS

132.    Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "131" as if fully set forth herein.

133.    Third-Party Defendants made the material misrepresentations and omissions as set forth herein to induce Eiffel to enter into the Churchland Assignment.

134.    Based upon these material misrepresentations and omissions, Eiffel entered into the Churchland Assignment.

135.    Upon information and belief, Third-Party Defendants intentionally made these misrepresentations to induce Eiffel to enter into the Churchland Assignment and make subsequent payments thereunder.

136.    Upon information and belief, the Third-Party Defendants knew that these representations were false at the time they were made to Eiffel.

137.    Eiffel reasonably relied upon the material misrepresentations made by the Third-Party Defendants when entering into the Churchland Assignment.

associated with the attempt to obtain approvals to develop the property.

**SECOND CLAIM AGAINST ALL**
**THIRD-PARTY DEFENDANTS**

139.    Third-Party Plaintiff repeats and realleges each and every allegation contained

in paragraphs "1" through "138" as if fully set forth herein.

140.    The Third-Party Defendants made the material misrepresentations referenced

herein to induce Eiffel to enter into the Lauren Tice Assignment.

141.    Based upon these material misrepresentations, Eiffel entered into the Lauren

Tice Assignment and remitted payment of $100,000 to Carpenter.

142.    Based on these material misrepresentations, Eiffel remitted an additional

payment of $50,000 to Carpenter as per the Lauren Tice Assignment.

143.    Upon information and belief, the Third-Party Defendants intentionally made

these material misrepresentations to Eiffel to induce it to enter into the Lauren Tice

Assignment and make payments thereunder.

144.    Upon information and belief, the Third-Party Defendants knew that these

statements were false at the time they were made to Eiffel.

145.    Eiffel reasonably relied upon the material misrepresentations made by the

Third-Party Defendants when entering into the Lauren Tice Assignment and making

payments thereunder.

21

146.    As a result of fraudulent misrepresentations made by the Third-Party Defendants, Eiffel has been damaged in the amount in excess of $150,000.00, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property.

**THIRD CLAIM AGAINST ALL**
**THIRD-PARTY DEFENDANTS**

147.    Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "146" as if fully set forth herein.

148.    The Third-Party Defendants made the material misrepresentations referenced herein to induce Eiffel to enter into the Clermont Assignment.

149.    Based upon these material misrepresentations, Eiffel entered into the Clermont Assignment.

150.    Upon information and belief, the Third-Party Defendants intentionally made these material misrepresentations to Eiffel to induce it to enter the Clermont Assignment and make payments thereunder.

151.    Upon information and belief, the Third-Party Defendants knew that these statements were false at the time they were made to Eiffel.

152.    Eiffel reasonably relied upon the material misrepresentations made by the Third-Party Defendants when entering into the Clermont Assignment.

153.    As a result of fraudulent misrepresentations made by Third-Party Defendants, Eiffel has been damaged in an amount in excess of $100,000.00.

22

**FOURTH CLAIM AGAINST**
**AACK LAND DEVELOPMENT, LLC.**

154.    Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "153" as if fully set forth herein.

155.    AACK breached the terms of the Churchland Assignment by failing to proceed in good faith with the subdivision process pursuant to the terms of the assignment and refusing to refund Eiffel's $100,000.00 deposit after it received notice of cancellation from Eiffel.

156.    In addition to the above, the Assignment provided that: "If the Assignor did not pursue with the entire approval process for the subdivisions, then the Assignee may, declare this Assignment null and void and all payments made here under shall be refunded to the Assignee immediately upon request and the Assignor shall also reimburse the Assignee for any costs incurred as a result, but not necessarily limited to legal fees and court costs and/or judgments".

157.    In breach of the Churchland Assignment, AACK failed to proceed diligently and in good faith with the approval process on the Churchland Properties.

158.    All legal fees incurred by Eiffel in furtherance of its claims are costs incurred as a result of AACK's breaches and its failure to proceed with the approval process.

159.    All expenses incurred by Eiffel in hiring the Engineers are costs incurred as a result of AACK's breaches and its failure to proceed with the approval process.

23

160.    As a result of AACK's breach of the Churchland Assignment, Eiffel has been damaged in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its claim in an amount to be determined at trial.

## FIFTH CLAIM AGAINST
## AACK LAND DEVELOPMENT, LLC.

161.    Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "160," as if fully set forth herein.

162.    The Churchland Assignment required AACK to apply for a 120-lot subdivision and allowed Eiffel to declare the agreement null and void if it did not obtain approvals for 60 lots.

163.    The condition of the Churchland Assignment could never have been fulfilled due to the conditions of and restrictions on the property.

164.    Eiffel does not have an adequate remedy at law for AACK's breach of the Churchland Assignment.

165.    Rescission of the Churchland Assignment will substantially restore the status quo among the parties thereto.

166.    As a result of AACK's breach, the Churchland Assignment should be rescinded.

24

## SIXTH CLAIM AGAINST
## FAIRVIEW BLOCK & SUPPLY CORP.

167.    Third-Party Plaintiff repeats and realleges each and every allegation contained

in paragraphs "1" through "166" as if fully set forth herein.

168.    Fairview breached the terms of the Lauren Tice Assignment by failing to

proceed with the subdivision process pursuant to the terms of the assignment and refusing to

refund Eiffel's $100,000 deposit after it received notice of cancellation from Eiffel.

169.    In addition to the above, the Lauren Tice Assignment provided that: "If the

Assignor did not pursue with the entire approval process for the subdivisions, then the

Assignee may, declare this Assignment null and void and all payments made here under shall

be refunded to the Assignee immediately upon request and the Assignor shall also reimburse

the Assignee for any costs incurred as a result, but not necessarily limited to legal fees and

court costs and/or judgments".

170.    In breach of the Lauren Tice Assignment, Fairview failed to proceed diligently

and in good faith with the approval process on the Lauren Tice Property.

171.    All legal fees incurred by Eiffel in furtherance of its claims are costs incurred

as a result of Fairview's breaches and its failure to proceed with the approval process.

172.    All expenses incurred by Eiffel in hiring the Engineers are costs incurred as a

result of Fairview's breaches and its failure to proceed with the approval process.

173.    As a result of Fairview's breach of the Lauren Tice Assignment, Eiffel has

been damaged in an amount in excess of $150,000, plus $32,596 for the costs associated with

25

the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and

expenses Eiffel will incur in furtherance of its claims in an amount to be determined at trial.

## SEVENTH CLAIM AGAINST
## FAIRVIEW BLOCK & SUPPLY CORP

174.    Third-Party Plaintiff repeats and realleges each and every allegation contained

in paragraphs "1" through "173" as if fully set forth herein.

175.    The Lauren Tice Assignment required Fairview to apply for a 28-lot

subdivision and allowed Eiffel to declare the agreement null and void if it did not obtain

approval for 17 lots.

176.    The condition of the Lauren Tice Assignment could never have been fulfilled

due to the conditions of and restrictions on the property.

177.    Eiffel does not have an adequate remedy at law for Fairview's breach of the

Lauren Tice Assignment.

178.    Rescission of the Lauren Tice Assignment will substantially restore the status

quo among the parties thereto.

179.    As a result of Fairview's breach, the Lauren Tice Assignment should be

rescinded.

## EIGHTH CLAIM AGAINST
## HORIZON REAL PROPERTY DEVELOPMENT, LLC

180.    Third-Party Plaintiff repeats and realleges each and every allegation contained

in paragraphs "1" through "179" as if fully set forth herein.

26

27

181.    Horizon breached the terms of the Clermont Assignment by failing to proceed with the subdivision process pursuant to the terms of the assignment and refusing to refund Eiffel's $100,000 deposit after it received notice of cancellation from Eiffel.

182.    In addition to the above, the Clermont Assignment provided that: "if the Assignor did not pursue with the entire approval process for the subdivisions, then the Assignee may, declare this Assignment null and void and all payments made hereunder shall be refunded to the Assignee immediately upon request and the Assignor shall also reimburse the Assignee for any costs incurred as a result, but not necessarily limited to legal fees and court costs and/or judgments".

183.    In breach of the Clermont Assignment, Horizon failed to proceed diligently and in good faith with the approval process on the Clermont Property.

184.    All legal fees incurred by Eiffel in furtherance of its claims are costs incurred as a result of Horizon's breaches and its failure to proceed with the approval process.

185.    All expenses incurred by Eiffel in hiring the Engineers are costs incurred as a result of Horizon's breaches and its failure to proceed with the approval process.

186.    As a result of Horizon's breach of the Clermont Assignment, Eiffel has been damaged in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its claims in an amount to be determined at trial.

## NINTH CLAIM AGAINST
## HORIZON REAL PROPERTY DEVELOPMENT, LLC

187.    Third-Party Plaintiff repeats and realleges each and every allegation contained

in paragraphs "1" to "187" as if fully set forth herein.

188.    The Clermont Assignment required Horizon to apply for a 42-lot subdivision

and allowed Eiffel to declare the agreement null and void if it did not get at least a 30-lot

subdivision.

189.    The conditions of the Clermont Assignment could never have been fulfilled

due to the condition of and restrictions on the property.

190.    Eiffel does not have an adequate remedy at law for Horizon's breach of the

Clermont Assignment.

191.    Rescission of the Clermont Assignment will substantially restore the status quo

among the parties thereto.

192.    As a result of Horizon's breach, the Clermont Assignment should be rescinded.

### JURY TRIAL DEMANDED

193.    Eiffel hereby demands a trial by jury of all issues so triable.

WHEREFORE, Third-Party Plaintiff Eiffel Investment Group and Associates LLC,

demands judgment on Eiffel's Third Party claims:

1)    on its first cause of action, an amount in excess of $100,000, plus $32,596 for

the costs associated with the attempt to obtain approvals to develop the property, plus interest

as provided by law;

28

2)    on its second cause of action, an amount in excess of $150,000, plus $32,596

for the costs associated with the attempt to obtain approvals to develop the property, plus

interest as provided by law;

3)    on its third cause of action, an amount in excess of $100,000, plus interest as

provided by law;

4)    on its fourth cause of action, an amount in excess of $100,000, plus $32,596 for

the costs associated with the attempt to obtain approvals to develop the property, plus the

attorneys' fees, costs and expenses Eiffel will incur in furtherance of its claims in an amount

to be determined at trial, plus interest as provided by law;

5)    on its fifth cause of action, rescission of the Churchland Assignment;

6)    on its sixth cause of action, an amount in excess of $150,000, plus $32,596 for

the costs associated with the attempt to obtain approvals to develop the property, plus the

attorneys' fees, costs and expenses Eiffel will incur in furtherance of its claims in an amount

to be determined at trial, plus interest as provided by law;

7)    on its seventh cause of action, rescission of the Lauren Tice Assignment;

8)    on its eighth cause of action, an amount in excess of $100,000, plus $32,596 for

the costs associated with the attempt to obtain approvals to develop the property, plus the

attorneys' fees, costs and expenses Eiffel will incur in furtherance of its claims in an amount

to be determined at trial, plus statutory interest as provided by law; and

9) on its ninth cause of action, rescission of the Clermont Assignment.

DATED:  Melville, New York
        July 6, 2007

LAZER, APTHEKER, ROSELLA
& YEDID, P.C.

By: _____
    Michele A. Pincus (MP-0333)
    Attorneys for Defendants and
    Third-Party Plaintiff
    225 Old Country Road
    Melville, New York 11747
    (631) 761-0800

30