**GREGG J. BORRI LAW OFFICES**
**61 Broadway, Suite 2125**
**New York, New York 10006**
**(212) 980-8866**

**Attorneys for Defendants & Counterclaim Plaintiff**
　　*Marie Pupke & Eiffel Investment Group and Associates, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
**KIMBERLY A. CARPENTER, et al.,**

　　　　　　　　　　　**Plaintiffs,**

　　　**-against-**　　　　　　　　　　　　　　**07 CIV 5689 (UA/LMS)**
　　　　　　　　　　　　　　　　　　　　　　　**ECF Case**

**MARIE PUPKE, et ano.,**

　　　　　　　　　　　**Defendants.**
-----------------------------------------------------------------------X
**EIFFEL INVESTMENT GROUP AND**
**ASSOCIATES, LLC,**　　　　　　　　　　　**FIRST AMENDED**
　　　　　　　　　　　　　　　　　　　　　　**ANSWER AND**
　　　　　　　　　　　**Counterclaim Plaintiff,**　　**COUNTERCLAIMS**

　　　**-against-**

**KIMBERLY A. CARPENTER,**
**ARTHUR ACKERT, JR.,**
**DENNIS LORE,**
**ARTHUR ACKERT, SR.,**
**SUPERIOR WALLS OF HUDSON VALLEY, INC.,**
**AACK LAND DEVELOPMENT, LLC,**
**HORIZON REAL PROPERTY DEVELOPMENT, LLC,**
**and FAIRVIEW BLOCK AND SUPPLY CORP.,**

　　　　　　　　　　　**Counterclaim Defendants.**
-----------------------------------------------------------------------X

　　　　Defendants Marie Pupke and Eiffel Investment Group and Associates LLC, by and

through their attorney Gregg J. Borri, for their answer to plaintiffs' complaint allege as follows:

　　　　1.　　　Defendants deny the allegations of paragraph 1.

　　　　2.　　　Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraphs 2 through 6.

3.      Defendants admit the allegations of paragraphs 7 and 8.

4.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9.

5.      Defendants admit the allegations of paragraph 10, except deny that the agreement entered with AACK Land Development was entered in September of 2006.

6.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 11 and 12.

7.      Defendants deny the allegations of paragraphs 13, 14 and 15, except that defendants admit the existence of the assignment agreements and refer the Court to the assignment agreements for interpretation of their true meaning and legal content, admit that Carpenter made certifications to Eiffel and admit that Eiffel remitted monies to Carpenter's escrow account.

8.      Answering the allegations of paragraph 16, defendants admit the existence of an assignment agreement with respect to the purchase of property located on Lauren Tice Road, Saugerties, New York, refer the Court to that assignment agreement for its true meaning and legal content and deny the remaining allegations.

9.       Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17.

10.     Answering the allegations of paragraph 18, defendants admit that Arthur Ackert Jr. advised Ms. Pupke of the purported sketch approval and requested monies, but deny the remaining allegations.

11.     Defendants deny the allegations of paragraph 19, except admit that Eiffel wired

$50,000 to Ms. Carpenter's escrow account based on the representation of Arthur Ackert of the purported sketch approval for the Lauren Tice property.

12.     Answering the allegations of paragraph 20, defendants admit that defendants received an email on February 26, 2007 from Ms. Carpenter and refer the Court to that email for its true meaning and legal content. Deny the remaining allegations of paragraph 20.

13.     Defendants deny the allegations of paragraph 21, except admit that a letter, dated April 27, 2007, was sent via facsimile and by email, inquiring as to the status of its escrow deposit to Carpenter and refer the Court to that letter for its true meaning and legal content.

14.     Answering the allegations of paragraph 22, defendants admit that a letter was sent, via email, dated April 27, 2007.

15.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 23, except admit that Carpenter sent an email to defendants on April 26, 2007 and refer the Court to that email for its true meaning and legal content.

16.     Defendants deny the allegations of paragraphs 24 and 25, except admit that Ms. Pupke sent a letter to Arthur Ackert, Jr., Dennis Lore, and Superior Walls of the Hudson Valley, Inc. cancelling the assignment agreements and refer the Court to that letter for its true meaning and legal content and deny knowledge or information sufficient to form a belief as to whether Ms. Carpenter received a completed New York State Grievance Committee form from Ms. Pupke.

17.     Defendants deny the allegations of paragraphs 26 and 27.

18.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 28, 29, 30 and 31, except admit that a letter, dated May 5,

2007, was sent to Carpenter and refer the Court to the letter for its true meaning and legal content.

19.     Answering the allegations of paragraph 32, defendants admit that Ms. Pupke sent a letter on May 5, 2007 and refer the Court to that letter for its true meaning and legal content.

20.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 33 through 40.

21.     Defendants deny the allegation of paragraph 41.

## ANSWERING FIRST CAUSE OF ACTION

22.     Answering paragraph 42, defendants repeat and incorporate by reference their responses to the paragraphs 1 through 41 as if fully set forth herein.

23.     Defendants deny the allegations of paragraphs 43 through 46.

## FIRST DEFENSE

24.     The statements that plaintiffs assert are defamatory are truthful, in whole or in part, and thus cannot be the basis for a libel claim.

## SECOND DEFENSE

25.     The statements that plaintiffs assert are defamatory are the opinion of defendants, in whole or in part, and thus, cannot be the basis for a libel claim.

## THIRD DEFENSE

26.     The statements that plaintiffs assert are defamatory are privileged, in whole or in part, are thus cannot be the basis for a libel claim.

## FACTS RELEVANT TO THE COUNTERCLAIMS

## THE PARTIES

27.     Counterclaim-Plaintiff Eiffel Investment Group and Associates LLC ("Eiffel"), is a Florida limited liability company with an address in Delray Beach, Florida.  Marie Pupke and Mark Pupke are officers of Eiffel.

28.     Eiffel is in the business of real estate sales and development.

29.     Upon information and belief, Counterclaim-Defendant Kimberly A. Carpenter ("Carpenter") is an individual residing in New Rochelle, New York.

30.     Upon information and belief, Carpenter is a member of the New York State bar in good standing.

31.     Upon information and belief, Counterclaim-Defendant Arthur Ackert, Jr. ("Ackert, Jr.") is an individual residing in Poughkeepsie, New York.

32.     Upon information and belief, Counterclaim-Defendant Dennis Lore ("Lore") is an individual residing in Stormville, New York.

33.     Upon information and belief, Counterclaim-Defendant Arthur Ackert, Sr. ("Ackert, Sr.") is an individual residing in the state of New York.

34.     Upon information and belief, Counterclaim-Defendant Superior Walls of the Hudson Valley, Inc. ("Superior") is a New York corporation with an office at 68 Violet Avenue, Poughkeepsie, New York.

35.     Upon information and belief, Counterclaim-Defendant AACK Land Development, LLC ("AACK") is a New York limited liability company with an office at 68 Violet Avenue, Poughkeepsie, New York.

36.     Upon information and belief, Counterclaim-Defendant Fairview Block and Supply

Corp. ("Fairview") is currently an inactive New York corporation, was dissolved by proclamation in 2001, and previously maintained an office at 68 Violet Avenue, Poughkeepsie, New York.

37.    Upon information and belief, Counterclaim-Defendant Horizon Real Property Development LLC ("Horizon") is a New York limited liability company with an office at 68 Violet Avenue, Poughkeepsie, New York.

38.    Upon information and belief, Counterclaim-Defendants Lore, Ackert, Jr., Ackert, Sr., and Superior are partners or joint venturers in the real estate transactions that are the subject of these counterclaims -- properties referred to herein as Churchland Road, Lauren Tice Road and Clermont --- and held themselves out to Eiffel as partners or joint venturers in said transactions.

39.    Upon information and belief, at all material times, Counterclaim-Defendants Lore, Ackert, Jr. and Ackert Sr., were either principals, partners, shareholders or members orchestrating the subject transactions on behalf of Horizon, Fairview, AACK and Superior.

40.    At all times material, Lore, Ackert, Jr., and Ackert, Sr., acted not only in their individual capacities, but also in their capacities as agents for AACK, Fairview, Horizon and Superior.

41.    Upon information and belief, Counterclaim-Defendants Lore,  Ackert, Jr., and Ackert, Sr., used these companies interchangeably to conduct business and in an attempt to insulate themselves from personal liability.

42.    Upon information and belief, Lore and Ackert, Jr., acted for the partnership and under the guise of Horizon, Fairview, AACK and Superior to further their scheme to defraud the Counterclaim-Plaintiff.

## JURISDICTION

43.    This Court has jurisdiction over this matter based on diversity of

citizenship and amount in controversy under 28 U.S.C. Section §1332.

## THE CHURCHLAND PROPERTIES

### Contract for Parcel I

44.    On or about June 12, 2006, Independence Community Bank as custodian for John

R. Addrizzo, MD IRA and for Amalicia Addrizzo, IRA of Staten Island, New York, as sellers,

entered into a contract with Counterclaim-Defendant AACK, as purchaser, for the purchase of 100

acres of land in the Town of Saugerties, County of Ulster ("Churchland Contract I").

45.    AACK was represented in the transaction by Counterclaim-Defendant Carpenter.

46.    Pursuant to the June 12, 2006 contract, the purchase price of Parcel I was

$1,200,000. Upon the signing of the June 12, 2006 contract by seller's attorney, $120,000 was to

be held in escrow by the law firm of Maynard, O'Connor, Smith & Catalinotto, LLP.

47.    The Churchland Contract I was conditioned upon purchaser obtaining approval

from the Town of Saugerties for a 40-lot subdivision for the 100-acre parcel by December 1, 2006.

48.    An addendum to the Churchland Contract I provided that: (i) the purchaser shall

have a 90-day period to do whatever inspections and inquiries it deemed necessary to

determine if an application for at least a 40-lot subdivision is feasible and if it was determined

not to be feasible purchaser would have the right to return of all amounts paid under the contract;

(ii) the purchaser would initiate an application with the Town of Saugerties for a subdivision,

the number of lots being that which is determined by engineering studies to be feasible, but in

no event less than 40 lots; (iii) that upon execution of the contract the purchaser shall apply to

the town of Saugerties for a subdivision of a maximum number of lots that is determined

feasible under ordinary engineering practices; and (iv) that the purchaser had a duty and obligation to process the subdivision application in an expeditious manner.

49.     The addendum also purported to reduce the down payment to $12,000.00 from $120,000.00.

50.     The Churchland Contract I also provided that in the event the purchaser was unable to obtain approval of at least a 40-lot subdivision, purchaser would have the option of declaring the contract null and void and receiving a return of its down payment or proceeding to closing without such approval.

**Contract for Parcel II**

51.     On or about June 12, 2006, Independence Community Bank as custodian for John R. Addrizzo, MD IRA and Amalicia Addrizzo, IRA, as sellers, entered into a contract with AACK, as purchaser, in the amount of $612,000 for purchase of a second property in the Town of Saugerties, County of Ulster consisting of plus/minus 51 acres ("Churchland Contract II").

52.     AACK was represented in the transaction by Counterclaim-Defendant Carpenter.

53.      Churchland Contract II provided that upon signing the contract, a deposit of $61,200 was to be held in escrow by seller's attorney.

54.     The contract was conditioned upon the purchaser obtaining approval from the Town of Saugerties for a 20-lot subdivision for the parcel for a 51+ acre parcel by December 1, 2006.

55.     An addendum to the Churchland Contract II provided that (i) that the purchaser shall have a 90 day period to do whatever inspections and inquiries it deemed necessary to determine if an application for at least a 20-lot subdivision is feasible and if it was determined not to be feasible purchaser would have the right to return of all amounts paid under the

contract. (ii) the purchaser was going to initiate an application with the Town of Saugerties for a subdivision, the number of lots being that which is determined by engineering studies to be feasible, but in no event less than 20 lots; (iii) that upon execution of the contract the purchaser shall apply to the town of Saugerties for a subdivision of a maximum number of lots that is determined feasible under ordinary engineering practices; and (iv) that the purchaser had a duty and obligation to process the subdivision application in an expeditious manner.

56.     The addendum also purported to reduce the down payment to $6,120.00 from $61,200.00.

57.     The Churchland Contract II also provided that in the event the purchaser was unable to obtain approval of at least a 20-lot subdivision, purchaser would have the option of declaring the contract null and void and receiving a return of its down payment or proceeding to closing without such approval.

## THE CHURCHLAND ASSIGNMENT

58.     On or about July of 2006, Eiffel, a Florida company, decided to look for land to develop in upstate New York.

59.     Having little knowledge of the New York real estate market, Mr. and Mrs. Pupke, acting as officers of Eiffel, were introduced to Lore.

60.      On or about July 21, 2006, Mr. and Mrs. Pupke held discussions with Dennis Lore and Arthur Ackert, Jr., concerning the potential assignment of the Churchland Contracts.  During the discussions Lore and Ackert, Jr., advised the Pupkes of their proposed development of the Churchland property and proposed to assign their rights in the Churchland Contracts to Eiffel in return for payments totaling $300,000.00, and proposed that Lore, Ackert, Jr., and their partners would undertake to obtain subdivision approval of their proposed development on behalf of

Eiffel.

61.     During these discussions, Lore made the following representations to the Pupkes and Eiffel concerning the Churchland properties:

a.  That an engineer retained by Lore and his partners had conducted due diligence with respect to the 104 lot subdivision that Lore and his partners proposed to develop on Parcels I and II of the Churchland properties and had concluded that the 104 lot subdivision that Lore and his partners proposed to develop on the site was feasible;

b.  That Lore and his partners had paid to the sellers of the Churchland properties a deposit of $181,200.00 on the contracts for the purchase of Parcel I and Parcel II of the Churchland properties and that that deposit would be assigned to Eiffel as part of the proposed assignment transaction;

c.  That Lore and his partners expected to be able to obtain approval of their proposed subdivision within a year, but more likely six months;

d.  That after subdivision approval, each of the lots could be sold for approximately $100,000.00 and that by doing road work after subdivision approval Eiffel could "clear" five million dollars from the sale of the lots;

62.     During these discussions, Ackert, Jr., made the following representations to the Pupkes and Eiffel concerning the Churchland properties:

a.  That an engineer retained Lore and his partners had conducted due diligence with respect to the 104 lot subdivision that Lore and his partners proposed to develop on Parcels I and II of the Churchland properties and had concluded that the 104 lot subdivision that Lore and his partners proposed to develop on the site was

feasible;

  b. That Ackert, Jr. and his partners had paid to the sellers of the Churchland

    properties a deposit of $181,200.00 on the contracts for the purchase of Parcel I

    and Parcel II of the Churchland properties and that that deposit would be assigned

    to Eiffel as part of the proposed assignment transaction;

  c. That Ackert, Jr. and his partners expected to be able to obtain approval of their

    proposed subdivision within a year, but more likely six months;

  d. That after subdivision approval each of the lots could be sold for approximately

    $100,000.00 and that by doing road work after subdivision approval Eiffel could

    "clear" five million dollars from the sale of the lots;

  63. Lore, Ackert, Jr., and their partners and Carpenter also furnished to the Pupkes

contracts for the purchase of the Churchland properties stating that a deposit of $181,200.00 had

been placed on the properties.  Defendants concealed and did not furnish until later addendums

to the contracts that reduced the deposit to $16,800.00

  64. AACK was represented by Carpenter.

  65. Lore represented to Eiffel that the transaction would run more smoothly if the

parties did not retain counsel.

  66. Based on the foregoing, Eiffel did not retain counsel to represent it in the

transaction.

  67. During the course of the discussions Lore failed to advise Eiffel that his partner,

Ackert, Jr., was Carpenter's sister.

  68. Subsequent to the initial discussions, Marie Pupke communicated with Kimberly

Carpenter in connection with the drafting of the assignment of the Churchland Contracts, the

execution of the assignment and the transfer of funds by Eiffel in connection with the assignment

of the Churchland Contracts.  During said discussions, Kimberly Carpenter represented to Marie

Pupke that a deposit of $181,200.00 had been made on the contracts for the purchase of Parcel I

and Parcel II of the Churchland properties.

69.    At all material times, Lore, Ackert, Jr., and Carpenter knew the aforementioned

representations to be false and made said representations with the intent of inducing Eiffel to

enter into the assignments and to pay monies for the assignments.

70.    The Pupkes and Eiffel justifiably relied on the aforementioned misrepresentations.

71.    In reliance on the above-stated misrepresentations, Eiffel executed the assignment

agreement relating to the Churchland Road properties.

72.    Pursuant to the terms of the Churchland Assignment, Eiffel was to pay AACK a

total of $300,000 and the $181,200 that AACK had purportedly already deposited in escrow with

the seller was to become the property of Eiffel.

73.    Pursuant to the terms of the assignment, Eiffel was to transfer $100,000.00 to

Carpenter's escrow account to be disbursed to AACK upon the receipt of a certification letter

from Carpenter certifying the validity of the contract; that the deposit was in escrow and that the

contracts were fully assignable.

74.    The balance of the $200,000 was payable in two installments. The first payment of

$100,000 was due within sixty (60) days of conceptual approval of the subdivision by the

planning board. The second payment of $ 100,000 was due within sixty (60) days of preliminary

approval of the subdivision by the planning board or upon final approval, whichever occurred

first.

75.    Pursuant to the terms of the Churchland assignment, AACK retained full

responsibility for doing all acts necessary to obtain subdivision approval for the Churchland properties. The Churchland assignment contemplated that AACK would apply to the town for subdivision approval and retain necessary professionals to pursue the approval. AACK was to apply for a 120-lot subdivision and, in the event it was unable to obtain final approval for at least a 60-lot subdivision, then Eiffel had the right to declare the agreement null and void and AACK was required to return all of Eiffel's monies immediately upon request.

76.     Following execution the Churchland Assignment, Eiffel paid $100,000.00 into Carpenter's escrow account.

77.     Immediately after the Eiffel had wired $100,000.00 to Carpenter's escrow account, Marie Pupke learned that Carpenter was now stating that only $16,800, rather than $181,200.00, had been deposited on the Churchland Contracts. Marie Pupke directed Carpenter not to disburse the $100,000.00 from her escrow account and Carpenter agreed not to do so. Upon information and belief, despite the misrepresentation, and Marie Pupke's direction not to disburse the funds, and Carpenter's agreement not to disburse the funds, Carpenter subsequently disbursed the $100,000.00 from her escrow account.

**THE LAUREN TICE PROPERTY**

78.     By contract dated January 13, 2006 ("Lauren Tice Contract"), Norman Heese, as seller, entered into a contract of sale with Counterclaim-Defendant Fairview, as purchaser, for the purchase of 80 acres of land on Lauren Tice Road in the Town of Saugerties, County of Ulster ("Lauren Tice Property"). The purchase price of the property was $450,000.

79.     An initial earnest money deposit in the amount of $5,000 was to be paid and an additional $20,000 down payment was to be made upon the signing of the Lauren Tice Contract. The $25,000 down payment was to be held in escrow by George Redder, Esq., attorney for

seller. The balance of $425,000 was to be paid in cash or bank check at closing. Upon

information and belief, the down payment was made.

80.    The Lauren Tice Contract was conditioned upon: (i) review of site

accessibility/road frontage: ingress and egress; (ii) subdivision approval for 2-acre lot

subdivisions; (iii) municipal approval of a 17 lot subdivision plan.

81.    An Addendum to the Lauren Tice contract provided that: (i) the purchaser was

going to initiate an application with the Town of Saugerties for a 17-lot subdivision; (ii) the

purchaser had a duty and obligation to process the subdivision application in an expeditious

manner; (iii) the purchaser shall have a 60-day period to do whatever inspections and inquiries it

deemed necessary to determine if an application for at least a 17-lot subdivision is feasible and if

it was determined not to be feasible purchaser would have the right to return of all amounts paid

under the contract.

82.    Fairview was represented by Counterclaim-Defendant Carpenter.

<strong>THE LAUREN TICE ASSIGNMENT</strong>

83.    On or about the same time Eiffel was negotiating the terms of the

Churchland assignment, in or about August and September 2006, Lore mentioned another

"lucrative" property which he had under contract.

84.    On or about August and September of 2006, Lore and Ackert, Jr., on behalf of

themselves, Fairview and their partners, represented to the Pupkes and Eiffel with respect to the

Lauren Tice property that:

   a.    They had already obtained from the town of Saugerties conceptual approval for 16

          lots on the property;

   b.    That they had sought a variance to rezone the property to enable smaller lots, had

14

obtained approval for that variance from the town attorney and that their engineer

had advised that approval for 20 to 30 lots on the property could therefore be

obtained;

c.  That their engineer had conducted due diligence on the property and concluded

that their proposed subdivision of 25 lots was feasible;

d.  That the Lauren Tice contract "is in full force and effect and fully assignable" and

that Horizon "has the full right and authority to transfer said contract…."; and

e.  That Fairview "is currently in good standing with the Secretary of State of New

York and is currently incorporated and actively licensed to conduct such

business."

85.    The aforementioned representations were false when made, Counterclaim

Defendants knew them to be false, and said misrepresentations were made with the intent of

inducing Eiffel to enter into an assignment of the Lauren Tice contract and paying monies

therefore.

86.    In reliance on these representations, Eiffel entered into an assignment agreement

with Fairview, dated September 27, 2006, and paid $50,000.00 into Carpenter's escrow account.

87.    Pursuant to the Lauren Tice assignment, Eiffel was to pay to Fairview the sum of

$150,000 and the $25,000 deposit paid in escrow to the Seller became the property of Eiffel.

88.    The $150,000 was payable in three installments.  $50,000 was to be paid into

Carpenter's escrow account upon: a) delivery of the executed assignment; b) delivery of a copy

of the contract with all addendums and riders with a copy of the escrow deposit check; and c)

delivery of a certification letter from Carpenter certifying that Fairview has not assigned or

encumbered its title in the contract and that Fairview was duly incorporated and in good

standing.

89.     The second $50,000 installment was due within thirty (30) days of sketch approval of the subdivision by the planning board and the third $50,000.00 installment was to be paid within thirty (30) days of preliminary approval of the subdivision by the town planning board.

90.     Pursuant to the terms of the Lauren Tice assignment, Fairview retained full responsibility for doing all acts necessary to obtain subdivision approval for the Lauren Tice property.  The Lauren Tice assignment contemplated that Fairview would apply to the town for subdivision approval and retain all necessary professionals to pursue the approval.  Pursuant to the assignment, Fairview agreed to apply for a 28-lot subdivision.  In the event that Fairview could not obtain final approval for at least a 17-lot subdivision, Eiffel could declare the agreement null and void and obtain the return of all monies paid.

91.     Following execution of the Lauren Tice assignment, Carpenter submitted two letters of certification to Eiffel representing that: (i) "Arthur Ackert Jr. and Dennis Lore as representatives of Fairview have full authority and power to assign the contract"; and (ii) that "Fairview Block is currently in good standing with the Secretary of State of New York where it is incorporated and authorized to do business."

92.     In reliance on the foregoing letters of certification, Eiffel paid $50,000.00 into Carpenter's escrow account.

93.     Upon information and belief, Carpenter's certifications regarding the condition of Fairview were false, Carpenter knew them to be false and Carpenter had no right to release the $50,000.00 from escrow based on the false certifications.

94.     Upon information and belief, Carpenter thereafter disbursed the 50,000.00 paid into her escrow account by Eiffel.

## THE CLERMONT CONTRACT

95.     On or about May 26, 2006, Alicia Turek Collins, as seller, entered into a contract (the "Clermont Contract") with Horizon Real Property Development LLC, as purchaser, for the purchase of property located in both the Town of Clermont, and the Town of Livingston, County of Columbia, consisting of approximately 150 acres of land (the "Clermont Property").

96.     Pursuant to the Clermont Contract, the purchase price was $1,650,000.

97.     The Clermont Contract was contingent on the purchaser making an application for a minimum of a 30-lot subdivision and making a diligent effort to complete the application within 180 days.

98.     The Clermont Contract also provided that: (i) that the purchaser had 90 days to do whatever inspections and inquiries purchaser deemed necessary to determine if an application for at least a 30-lot subdivision was feasible; (ii) the purchaser was going to initiate an application for a subdivision, the number of lots being that which is determined by engineering studies to be feasible, but in no event less than 30 lots, and (iii) that the purchaser had the duty and obligation to process the application in an expeditious manner.

99.     In the event that the Horizon was unable to obtain approval for at least a 30-lot subdivision, Horizon would have the option of declaring the contract null and void and receiving the return of its down payment.

## THE CLERMONT ASSIGNMENT

100.    On or about August and September 2006, in behalf of themselves, their partners, and Horizon, Lore and Ackert, Jr., represented to the Pupkes and Eiffel that they had had an engineer retained by them conduct due diligence on the Clermont property and that the engineer had concluded that they could obtain a minimum of a 42-lot subdivision on the Clermont

Property.

101.    Horizon provided Eiffel with two maps representing that they could obtain a subdivision of 42 lots.

102.    An assignment was prepared by Carpenter providing that Eiffel was to pay Horizon the sum of $300,000.00. The sum of $150,000 was to be paid to Carpenter's escrow account upon delivery of: (i) the executed assignment by the parties; (ii) a copy of the underlying contract; and (iii) a certification letter from Carpenter.

103.    The balance of $150,000 was to be paid in two installments. The first payment of $75,000 was due within 30 days of receipt of sketch approval and the second payment of $75,000 was due within 60 days of receipt of preliminary approval of the subdivision or receipt of all final approvals.

104.    Pursuant to the terms of the Clermont assignment, Horizon retained full responsibility for doing all acts necessary to obtain subdivision approval for the Clermont Property. The Clermont assignment contemplated that Horizon would apply to the town for the subdivision approval and retain all necessary professionals to pursue the approval.  Horizon was to apply for approval of a 42-lot subdivision and, in the event it was unable to obtain final approval for at least a 30-lot subdivision, then Eiffel could declare the agreement null and void and would be entitled to the return of all its payments.

105.    In the assignment, Horizon warranted and represented that the underlying contract was in full force and effect and "is fully assignable", and that assignor had "full right and authority to transfer said contract."

106.    Based on the aforementioned representations, Eiffel entered into an assignment agreement with Horizon, dated September 27, 2006, and paid $150,000.00 into Carpenter's

18

escrow account.

107.    Carpenter, who had drafted the Clermont assignment, in a certification letter dated September 28, 2006, represented and certified to Eiffel that "the subject contract is assignable in accordance with Paragraph 15 of the addendum to the contract" and that "Seller's permission for the assignment is not required."

108.    In reliance on Carpenters' certification letters, Eiffel paid $150,000.00 into Carpenter's escrow account.  Upon information and belief, Carpenter released the $150,000 deposited into escrow by Eiffel based on her certification letter.

109.    The aforementioned representations, warranties, and certifications regarding the feasibility of a 42-lot subdivision and the assignability of the underlying Clermont Contract were false.  Upon information and belief, Lore and Ackert, Jr., Horizon and their partners had made no engineering study to determine the feasibility of such a development and in fact no such development was feasible.  Further, the assignment required the consent of the sellers and the sellers never consented or refused to consent to the assignment when asked to do so.

## COUNTERCLAIM-DEFENDANTS' CONDUCT FOLLOWING THE EXECUTION OF THE ASSIGNMENTS

110.    Although Counterclaim Defendants Lore, Ackert, Jr., and their partners and AACK, Fairview and Horizon were responsible under the assignments for diligently prosecuting applications for subdivision approval, they failed to do so.  Instead, Lore and Ackert, Jr., purposely avoided taking actions to properly pursue subdivision approvals and instead focused their efforts on obtaining meaningless sketch approvals of their proposals so that they could induce Eiffel to pay more monies even though no meaningful progress toward final subdivision approvals had been made.

111.    Disregarding the advice of the professional surveyor they had retained, Lore and

Ackert, Jr., caused to be prepared and submitted to the towns of Saugerties and Clermont sketch maps of their proposed subdivisions that were not based on sound engineering practices or investigations and that made no realistic contribution to the advancement of the subdivision approval process for the three properties.  Among other deficiencies, the maps failed to take into account wetlands located on the properties, failed to assess the issue of access to the Lauren Tice property and failed to meaningfully assess the lot yields proposed by Lore and Ackert, Jr., in the maps.

112.    The sketch maps submitted by Lore and Ackert, Jr., with respect to the Churchland Road property, the Lauren Tice property, and the Clermont property were not based on adequate engineering due diligence and study, and were submitted as part of an effort to obtained a meaningless sketch approval of the maps from the towns so that Eiffel would be obliged to pay additional monies due upon receipt of sketch approvals.

113.    In a letter dated November 27, 2006, Ackert, Jr., writing on behalf of Superior, represented to Eiffel that sketch approval had been obtained for the Lauren Tice Property at a Saugerties Town Board Meeting the night before.

114.    In that letter, Ackert, Jr., requested that Eiffel remit a check for $50,000 as per the terms of the Lauren Tice assignment.

115.    Based on Ackert, Jr.,'s representation, Eiffel remitted payment of $50,000 to Carpenter.

116.    Three days later, on or about November 30, 2006, Ackert Jr., on behalf of Superior, represented to Eiffel that "the Town of Saugerties has given the go ahead on the Churchland Road property for 104 building lots." The letter also requested that Eiffel remit $100,000 as per the terms of the Churchland assignment.

117.   This representation was false.

118.   Counterclaim-Defendants demanded that Eiffel remit $26,195.99 purportedly to pay for the costs for aerial photos for the properties, maps and tax reimbursements, which Eiffel did.

119.   During the first several months of 2007, the engineering firm retained by Lore and Ackert, Jr.,  Leo J. Carroll, P.E., L.S. & Associates, a company specializing in surveying, engineering and land planning, advised Eiffel that Lore and Ackert, Jr,  had done or caused to be done little or no due diligence or engineering investigation of the three properties, and that the proposed subdivisions reflected on the maps submitted by Lore and Ackert, Jr., to the towns were not based upon engineering studies of feasibility.

120.   At or about the same time, Tonche Timber, a professional forestry and nature resource consultant company, advised that the Churchland and Clermont properties had extensive regulated wetlands located thereon that had not been delineated or taken into account in the proposed subdivision maps submitted to the towns of Saugerties and Clermont by Lore and Ackert, Jr., and that basic engineering studies and due diligence had not been performed with respect to the proposed developments.

121.   The firms of Leo J. Carroll, P.E., L.S. & Associates and Tonche Timber advised Eiffel that the subdivisions proposed by Lore and Ackert, Jr., for the Churchland and Lauren Tice properties were not feasible.

122.   During the first several months of 2007, the owner of the Lauren Tice property became impatient with the failure of Lore and Ackert, Jr. to diligently pursue the application for subdivision approval as per the Lauren Tice contract, declared a breach of the contract, and terminated the Lauren Tice contract.

123.    When Carpenter, on behalf of Lore, Ackert, Jr. and their partners and Horizon, finally advised the sellers of the Clermont property of the assignment and requested approval of the assignment, the sellers refused to consent to the assignment and refused to confirm that the contract was in good standing.

124.    Eiffel paid the firms of Leo J. Carroll, P.E., L.S. & Associates and Tonche Timber in excess of $6,400 for their work at the Churchland, Lauren Tice and Clermont properties.

125.    In a letter dated April 30, 2007, Eiffel notified Lore of its intent to void the Churchland and Lauren Tice assignments and demanded a full refund of the $250,000.00 it had deposited with Carpenter pursuant to those assignments.

126.    To date, the Counterclaim-Defendants have failed and refused to refund any of Eiffel's money.

127.    Upon information and belief, the Counterclaim-Defendants knew that the subdivision projects proposed for and contemplated by the Churchland, Lauren Tice and Clermont assignments could not be accomplished in accordance with their representations or as set forth in the assignments at the time Eiffel entered the assignments in August and September of 2006.

128.    Upon information and belief, the Counterclaim-Defendants knew that it would be impossible to obtain subdivision approvals for the number of lots set forth in each of the assignment agreements.

129.    Upon information and belief, the Counterclaim-Defendants knew that wetlands existed on the properties which would seriously limit, if not completely destroy, the ability to develop the properties as contemplated by the assignments.

130.    Upon information and belief, the Counterclaim-Defendants had no intention of

pursuing preliminary or final approvals for the subdivisions when they entered into the assignment agreements.

131.     Counterclaim Defendants deliberately concealed all of this information from Eiffel.

**FIRST COUNTERCLAIM AGAINST ALL
COUNTERCLAIM-DEFENDANTS
(Churchland Assignment - Fraud)**

132.     Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131, 160 through 163, and 249 through 254, as if fully set forth herein.

133.     Counterclaim-Defendants Lore, Ackert, Jr., Carpenter and AACK intentionally made the material misrepresentations and omissions as set forth herein to induce Eiffel to enter into the Churchland assignment and to make subsequent payments thereunder.

134.     As partners, Lore, Ackert, Jr., Ackert, Sr. and Superior, stood to financially benefit from the assignment.

135.     Based upon her familial relationship, Carpenter stood to personally benefit for the assignments.

136.     With a personal profit motive in mind, Carpenter, Ackert, Jr., Ackert, Sr., and Lore knowingly participated in a collective scheme to falsely induce Eiffel to execute the Churchland assignment and to pay monies pursuant thereto.

137.     Upon information and belief, the Counterclaim-Defendants knew that these representations were false at the time they were made to Eiffel.

138.     Eiffel reasonably relied upon the material misrepresentations made by the Counterclaim-Defendants in entering into the Churchland assignment and in remitting payments

thereunder.

139.    As a result of fraudulent misrepresentations and omission made by the

Counterclaim- Defendants, Eiffel has been damaged in the amount of $100,000, plus $32,596 for

the costs associated with the attempt to obtain approvals to develop the Churchland property.

140.    In addition to their direct liability for their tortious conduct, Counterclaim

Defendants Lore, Ackert, Jr., Ackert, Sr., and Superior, as partners, are individually liable for the

fraud committed by the partnership.

### SECOND COUNTERCLAIM AGAINST ALL COUNTERCLAIM-DEFENDANTS
### (Lauren Tice Assignment - Fraud)

141.    Counterclaim-Plaintiff repeats and realleges each and every allegation

contained in paragraphs 27 through 131, 160 through 163, and 249 through 254, as if fully set

forth herein.

142.    The Counterclaim-Defendants Lore, Ackert, Jr., Carpenter, and Fairview

intentionally made the material misrepresentations and omission referenced herein to induce

Eiffel to enter into the Lauren Tice assignment and to make subsequent payments thereunder.

143.    As partners, Lore, Ackert, Jr., Ackert, Sr. and Superior, stood to financially benefit

from the assignment.

144.    Based upon her familial relationship, Carpenter stood to personally benefit for the

assignments.

145.    With a personal profit motive in mind, Carpenter, Ackert, Jr., Ackert, Sr., and

Lore knowingly participated in a collective scheme to falsely induce Eiffel to execute the Lauren

Tice assignment and to pay monies pursuant thereto.

146.    Upon information and belief, the Counterclaim-Defendants knew that these

statements were false at the time they were made to Eiffel.

147. Eiffel reasonably relied upon the material misrepresentations made by the Counterclaim-Defendants when entering into the Lauren Tice assignment and making the two payments of $50,000.00 each and the payments of costs thereunder.

148. As a result of fraudulent misrepresentations made by the Counterclaim-Defendants, Eiffel has been damaged in the amount in excess of $100,000.00, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the Lauren Tice property.

149. In addition to their direct liability for their tortious conduct, Counterclaim Defendants Lore, Ackert, Jr., Ackert, Sr., and Superior, as partners, are individually liable for the fraud committed by the partnership.

**THIRD COUNTERCLAIM AGAINST ALL
COUNTERCLAIM-DEFENDANTS
(Clermont Assignment - Fraud)**

150. Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131, 160 through 163, and 249 through 254, as if fully set forth herein.

151. The Counterclaim-Defendants Lore, Ackert, Jr., Carpenter, and Horizon made the material misrepresentations and omission referenced herein to induce Eiffel to enter into the Clermont assignment and to make subsequent payments thereunder.

152. As partners, Lore, Ackert, Jr., Ackert, Sr. and Superior, stood to financially benefit from the assignment.

153. Based upon her familial relationship, Carpenter stood to personally benefit for the assignments.

154. With a personal profit motive in mind, Carpenter, Ackert, Jr., Ackert, Sr., and Lore knowingly participated in a collective scheme to falsely induce Eiffel to execute the Lauren

Tice assignment and to pay monies pursuant thereto.

155. Upon information and belief, the Counterclaim-Defendants knew that these statements were false at the time they were made to Eiffel.

156. Eiffel reasonably relied upon the material misrepresentations made by the Counterclaim-Defendants in entering into the Clermont assignment and remitting payments thereunder.

157. As a result of fraudulent misrepresentations and omission made by the Counterclaim Defendants, Eiffel has been damaged in an amount in excess of $150,000.00, plus $32,596.00 for costs associated with attempts to obtain approvals to develop the Clermont property.

158. In addition to their direct liability for their tortious conduct, Counterclaim Defendants Lore, Ackert, Jr., Ackert, Sr., and Superior, as partners, are individually liable for the fraud committed by the partnership.

## FOURTH COUNTERCLAIM AGAINST
## CARPENTER
### (Aiding and Abetting Fraud)

159. Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 157 as if fully set forth herein.

160. Carpenter aided and abetted the fraud against Eiffel concerning the Churchland assignment by knowingly and falsely representing to Marie Pupke that a deposit of $181,200.00 had been placed on the Churchland properties and by releasing from her escrow account the $100,000 payment made on the Churchland assignment after being directed and agreeing not to do so.

161. Carpenter aided and abetted the fraud against Eiffel concerning the Lauren Tice

assignment by knowingly and falsely certifying that all parties to the underlying Lauren Tice contract were in good standing when in fact Fairview had not performed the engineering due diligence or feasibility analysis required under the underlying sales contract, by knowingly and falsely certifying that Fairview was in good standing with the Secretary of State when it was not, and by knowingly paying out monies she held in escrow pursuant to such false certifications.

162.    Carpenter also aided and abetted the fraud against Eiffel concerning the Lauren Tice assignment by threatening the Lauren Tice sellers with a lawsuit when they claimed that Fairview was not in compliance with the contract for failure to timely conduct due diligence and an engineering feasibility study and failing to diligently pursue subdivision approval, and by knowingly and falsely advising the sellers that Fairview had done its due diligence under the contract.

163.    Carpenter aided and abetted the fraud against Eiffel concerning the Clermont assignment by knowingly and falsely certifying that the underlying Clermont contract was assignable without the seller's permission and preparing the written representation and warranty made by Horizon in the Clermont assignment that the underlying contract was fully assignable when Carpenter knew that this was not the case, by knowingly and falsely certifying that all parties to the contract were in good standing when Horizon had not performed the engineering due diligence or feasibility analysis required under the underlying sales contract, and by paying out monies Carpenter held in escrow pursuant to such false certifications.

164.    As a result of Carpenter's knowing and material assistance to the fraud perpetrated by Lore, Ackert, Jr., Ackert, Sr., AACK, Fairview and Horizon, Eiffel has been damaged in an amount in to be determined at trial.

### FIFTH COUNTERCLAIM AGAINST
### AACK LAND DEVELOPMENT, LLC.
### (Breach of Churchland Assignment)

165.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

166.    AACK owed Eiffel and duty of good faith and fair dealing with respect to its obligations to Eiffel under the Churchland assignment, including its obligation to pursue subdivision approval of the proposed development on the Churchland property on behalf of Eiffel.

167.    AACK was acting as agent for Eiffel in pursuing the subdivision approvals on behalf of Eiffel under the Churchland assignment, and, as an agent, owed Eiffel a fiduciary duty, including a duty of the finest loyalty and honesty and good faith and fair dealing.

168.    The Churchland assignment provided that: "if Assignor does not pursue with the entire approval process, including final approvals, the Assignee may at his option declare this Assignment null and void and all payments made here under shall be refunded to the Assignee immediately upon request and the Assignor shall also reimburse the Assignee for any costs incurred as a result, but not necessarily limited to legal fees and court costs and/or judgments".

169.    In breach of the Churchland assignment, including its obligations of loyalty, honesty, and good faith and fair dealing, AACK failed to proceed diligently and in good faith with the subdivision approval process on the Churchland properties, but rather proceeded in a way calculated to maximize AACK's ability to obtain monies quickly from Eiffel rather than meaningfully advance the subdivision approval process.

170.    AACK's failure to proceed diligently and in good faith deprived Eiffel of the benefits of the assignment by failing to meaningfully advance the subdivision approval process and by failing to promptly determine the feasibility of the proposed subdivision.

171.    As a result of AACK's breach of the Churchland assignment, including its failure to pursue the approval process, Eiffel is entitled to the return of all monies paid pursuant to the assignment, including the $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its counterclaim in an amount to be determined at trial.

172.    All legal fees incurred by Eiffel in furtherance of its counterclaim are costs incurred as a result of AACK's breaches and its failure to proceed with the approval process.

173.    All expenses incurred by Eiffel in payment of professionals are costs incurred as a result of AACK's breaches and its failure to proceed with the approval process.

### SIXTH COUNTERCLAIM AGAINST
### AACK LAND DEVELOPMENT, LLC.
#### (Failure of Condition – Churchland Assignment)

174.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

175.    The Churchland assignment required AACK to apply for an approximately 120-lot subdivision with a central septic system and amenities, including clubhouse, tennis court, pool and basketball court.  It further provided that in the event that AACK was unable to obtain final approvals of at least a 60-lot subdivision then Eiffel had the option to declare the assignment null and void and receive the immediate return of all monies it had paid.

176.    AACK was unable to obtain approvals of at least a 60-lot subdivision due to the conditions of and restrictions on the property, and its failure to proceed diligently and in good

faith in accordance with the assignment.

177.   Eiffel, having declared the contract null and void, is entitled to the return of the monies it paid pursuant to the terms of the Churchland assignment.

### SEVENTH COUNTERCLAIM AGAINST
### AACK, LORE, ACKERT, Jr., ACKERT, Sr., and SUPERIOR
### (Breach of Fiduciary Duty - Churchland)

178.   Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

179.   Counterclaim-Defendants Lore and Ackert, Jr., had and represented that they had superior knowledge with respect to development of subdivisions in upstate New York and that they had a relationship with the planning boards in the towns of Saugerties and Clermont.

180.   Eiffel relied on Lore and Ackert's purported superior knowledge in entering into the Churchland assignment, which called for Counterclaim Defendants to apply for and obtain final approvals for the subdivisions proposed by Counterclaim Defendants.

181.   Counterclaim Defendants AACK, Lore and Ackert, Jr., and their partners Ackert, Sr., and Superior, agreed to act as Eiffel's agent in pursuing the necessary approvals for the proposed Churchland subdivision.

182.   As agents, owed Eiffel a fiduciary duty, including a duty of the finest loyalty and honesty and good faith and fair dealing.

183.   In breach of their fiduciary obligations of loyalty, honesty, and good faith and fair dealing, Counterclaim Defendants failed to proceed diligently and in good faith with the subdivision approval process on the Churchland properties, but rather proceeded counter to Eiffel's interests and in a way calculated to maximize their ability to obtain monies for sketch approvals quickly from Eiffel rather than meaningfully advance the subdivision approval

process.

184.    As a result of its breach of their breach of their fiduciary obligations, Counterclaim Defendants must forfeit their fees for undertaking the obligation to obtain subdivision approvals and are liable and indebted to Eiffel for the fees paid under the Churchland assignment, specifically including the $100,000.00 paid and for the monies paid by Eiffel for costs and expenses.

**EIGHTH COUNTERCLAIM AGAINST
FAIRVIEW BLOCK & SUPPLY CORP.
(Breach of Lauren Tice Assignment)**

185.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

186.    Fairview owed Eiffel and duty of good faith and fair dealing with respect to its obligations to Eiffel under the Lauren Tice assignment, including its obligation to pursue subdivision approval of the proposed development on the Lauren Tice property on behalf of Eiffel.

187.    Fairview was acting as agent for Eiffel in pursuing the subdivision approvals on behalf of Eiffel under the Lauren Tice assignment, and, as an agent, owed Eiffel a fiduciary duty, including a duty of the finest loyalty and honesty and good faith and fair dealing.

188.    The Lauren Tice assignment provided that: "if the Assignor does not pursue with the entire approval process, including final approvals, then the Assignee may declare this Assignment null and void and all payments made here under shall be refunded to the Assignee immediately upon request and the Assignor shall also reimburse the Assignee for any costs incurred as a result, but not necessarily limited to legal fees and court costs and/or judgments".

189.    In breach of the Lauren Tice assignment, including its obligations of loyalty,

honesty, and good faith and fair dealing, Fairview failed to proceed diligently and in good faith with the subdivision approval process on the Lauren Tice property, but rather proceeded in a way calculated to maximize Fairview's ability to obtain monies quickly from Eiffel rather than meaningfully advance the subdivision approval process.

190.    Fairview's failure to proceed diligently and in good faith deprived Eiffel of the benefits of the assignment by failing to meaningfully advance the subdivision approval process, by failing to promptly determine the feasibility of the proposed subdivision and by failing to abide by the underlying contract requiring Fairview to proceed expeditiously and promptly determine whether the proposed subdivision was feasible.

191.    As a result of Fairview's breach of the Lauren Tice assignment, including its failure to pursue the approval process, Eiffel is entitled to the return of all monies paid under the assignment, including the $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its counterclaim in an amount to be determined at trial.

192.    All legal fees incurred by Eiffel in furtherance of its counterclaim are costs incurred as a result of Fairview's breaches and its failure to proceed with the approval process.

193.    All expenses incurred by Eiffel in payment of professionals are costs incurred as a result of Fairview's breaches and its failure to proceed with the approval process.

## NINETH COUNTERCLAIM AGAINST
## FAIRVIEW BLOCK & SUPPLY CORP.
### (Failure of Condition - Lauren Tice Assignment)

194.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

195.    The Lauren Tice Assignment required Fairview to apply for a 28-lot subdivision.

The assignment also provided that in the event that Fairview was unable to obtain final approvals of at least a 17-lot subdivision, then Eiffel had the right to declare the assignment null and void and receive the immediate return of all its monies.

196.    Fairview was unable to obtain approvals of at least a 17 lot subdivision due to the conditions of and restrictions on the property, including lack of access, because the seller refused to cooperate with the proposed development, and because the seller terminated the contract due to Counterclaim Defendants' lack of diligence in pursuing subdivision approval.

197.    Eiffel, having declared the assignment null and void, is entitled to the return of the monies it paid pursuant to the terms of the Lauren Tice assignment.

### TENTH COUNTERCLAIM AGAINST
### AACK, LORE, ACKERT, Jr., ACKERT, Sr., and SUPERIOR
### (Breach of Fiduciary Duty – Lauren Tice)

198.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

199.    Counterclaim-Defendants Lore and Ackert, Jr., had and represented that they had superior knowledge with respect to development of subdivisions in upstate New York and that they had a relationship with the planning boards in the towns of Saugerties and Clermont.

200.    Eiffel relied on Lore and Ackert's purported superior knowledge in entering into the Lauren Tice assignment, which called for Counterclaim Defendants to apply for and obtain final approvals for the subdivision proposed by Counterclaim Defendants.

201.    Counterclaim Defendants AACK, Lore and Ackert, Jr., and their partners Ackert, Sr., and Superior, agreed to act as Eiffel's agent in pursuing the necessary approvals for the proposed Lauren Tice subdivision.

202.    As agents, owed Eiffel a fiduciary duty, including a duty of the finest loyalty and

honesty and good faith and fair dealing.

203.    In breach of their fiduciary obligations of loyalty, honesty, and good faith and fair dealing, Counterclaim Defendants failed to proceed diligently and in good faith with the subdivision approval process on the Lauren Tice property, but rather proceeded counter to Eiffel's interests and in a way calculated to maximize their ability to obtain monies for sketch approvals quickly from Eiffel rather than meaningfully advance the subdivision approval process.

204.    As a result of its breach of their breach of their fiduciary obligations, Counterclaim Defendants must forfeit their fees for undertaking the obligation to obtain subdivision approvals and are liable and indebted to Eiffel for the fees paid under the Lauren Tice assignment, specifically including the $100,000.00 paid and for the monies paid by Eiffel for cost and expenses.

### ELEVENTH COUNTERCLAIM
### AGAINST LORE, ACKERT, Jr., ACKERT, Sr.,
### CARPENTER, SUPERIOR and FAIRVIEW
### (Breach of Warranty – Lauren Tice)

205.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

206.    Lore, Ackert, Jr., individually and on behalf of their partners, Fairview and Carpenter, represented, warranted and certified that (i) the Lauren Tice contract "is in full force and effect and is fully assignable"; (ii) Fairview "has the full right and authority to transfer said contract"; (iii) "Fairview Block & Supply Corp. is currently in good standing with the Secretary of State of New York and is currently incorporated and actively licensed to conduct such business"; and (iv) Fairview was in good standing under the contract;

207.    Fairview breached its warranty and representation and its attorney's certification

34

was false because Fairview was not in good standing with the Secretary of State or actively licensed to conduct business and the contract was not in full force and effect or fully assignable because Fairview was a dissolved corporation at the time of the warranty and certification. Further, Fairview was not in good standing under the Lauren Tice contract because it had failed to timely conduct due diligence and a feasibility analysis concerning the feasibility of the proposed development.

208.    Eiffel has sustained damages in the amount of $150,000.00 due to said of warranty and Carpenter's false certification and Fairview and Counterclaim Defendants are liable and indebted to Eiffel for such damages.

**TWELFTH COUNTERCLAIM**
**AGAINST LORE, ACKERT, Jr.,  ACKERT, Sr.,**
**CARPENTER, SUPERIOR and FAIRVIEW**
**(Individual Liability for Acting for Dissolved Corporation –Lauren Tice)**

209.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

210.    Upon information and belief, Fairview had been dissolved by proclamation by the New York Secretary of State at the time it entered into the Lauren Tice contract and the Lauren Tice assignment.

211.    Arthur Ackert, Jr. and Dennis Lore, having executed the Lauren Tice assignment allegedly on behalf of a dissolved corporation, are liable individually on the Lauren Tice assignment.

212.    Ackert, Jr., Ackert, Sr., Lore and Superior, are liable on the Lauren Tice assignment in their capacity as partners.

**THIRTEENTH COUNTERCLAIM AGAINST**
**HORIZON REAL PROPERTY DEVELOPMENT, LLC**
**(Breach of Clermont Assignment)**

213.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

214.    Horizon owed Eiffel and duty of good faith and fair dealing with respect to its obligations to Eiffel under the Clermont assignment, including its obligation to pursue subdivision approval of the proposed development on the Clermont property on behalf of Eiffel.

215.    Horizon was acting as agent for Eiffel in pursuing the subdivision approvals on behalf of Eiffel under the Clermont Road assignment, and, as an agent, owed Eiffel a fiduciary duty, including a duty of the finest loyalty and honesty and good faith and fair dealing.

216.    The Clermont assignment provided that: "if the Assignor does not pursue with the entire approval process, including final appraisals, the Assignee may at its option declare this Assignment null and void and all payments made hereunder shall be refunded to the Assignee immediately upon request and the Assignor shall also reimburse the Assignee for any costs incurred as a result, but not necessarily limited to legal fees and court costs and/or judgments".

217.    In breach of the Clermont assignment, including its obligations of loyalty, honesty, and good faith and fair dealing, Horizon failed to proceed diligently and in good faith with the approval process on the Clermont Property, but rather proceeded in a way calculated to maximize Horizon's ability to obtain monies quickly from Eiffel rather than meaningfully advance the subdivision approval process.

218.    Horizon's failure to proceed diligently and in good faith deprived Eiffel of the benefits of the assignment by failing to meaningfully advance the subdivision approval process, by failing to promptly determine the feasibility of the proposed subdivision and by failing to abide by the underlying contract requiring Fairview to proceed expeditiously and promptly determine whether the proposed subdivision was feasible.

219.    As a result of Horizon's breach of the Clermont assignment, including its failure to pursue the approval process, Eiffel is entitled to the return of all monies paid under the assignment, including the $150,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its counterclaim in an amount to be determined at trial.

220.    All legal fees incurred by Eiffel in furtherance of its counterclaim are costs incurred as a result of Horizon's breaches and its failure to proceed with the approval process.

221.    All expenses incurred by Eiffel in payment of professionals are costs incurred as a result of Horizon's breaches and its failure to proceed with the approval process.

**FOURTEENTH COUNTERCLAIM AGAINST**
**HORIZON, LORE, ACKERT, Jr., ACKERT, Sr., and SUPERIOR**
**(Breach of Warranty and Certification - Clermont)**

222.    Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

223.    Lore, Ackert, Jr., individually and on behalf of their partners Ackert, Sr. and Superior, and Horizon warranted in the Clermont assignment that the underlying contract was fully assignable and that it had full right to assign the contract.

224.    Horizon's counsel Carpenter certified to Eiffel that the underlying contract was fully assignable and that the contract was assignable without the seller's permission and that all parties to the underlying contract were in good standing.

225.    Counterclaim Defendants breached their warranty and representation and its attorney's certification was false because the underlying contract required the consent of the seller to any assignment and the seller ultimately declined to consent to the assignment and because Horizon was not in good standing under the contract because it had failed to timely

conduct due diligence and a feasibility analysis concerning the feasibility of the proposed development.

226.     Eiffel has sustained damages in the amount of $150,000.00 due to said breach of warranty and Carpenter's false certification and Counterclaim Defendants are liable and indebted to Eiffel for such damages.

**FIFTEENTH COUNTERCLAIM AGAINST**
**HORIZON REAL PROPERTY DEVELOPMENT, LLC**
**(Failure of Condition - Clermont)**

227.     Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 to 131 as if fully set forth herein.

228.     The Clermont assignment required Horizon to apply for a 42-lot subdivision.  The assignment also provided that in the event that Horizon was unable to obtain final approvals of at least a 30-lot subdivision, then Eiffel had the right to declare the assignment null and void and receive the immediate return of all its monies.

229.     The conditions of the Clermont assignment could never have been fulfilled due to the condition of and restrictions on the property, and due to the fact that the sellers refused to consent to the assignment of the underlying contract to Eiffel or confirm that it was in good standing once the sellers received notice of the Clermont assignment.

230.     Eiffel is entitled to the return of the monies it paid pursuant to the terms of the assignment.

**SIXTEENTH COUNTERCLAIM AGAINST**
**AACK, LORE, ACKERT, Jr., ACKERT, Sr., and SUPERIOR**
**(Breach of Fiduciary Duty – Clermont)**

231.     Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

232.    Counterclaim-Defendants Lore and Ackert, Jr., had and represented that they had superior knowledge with respect to development of subdivisions in upstate New York and that they had a relationship with the planning boards in the towns of Saugerties and Clermont.

233.    Eiffel relied on Lore and Ackert's purported superior knowledge in entering into the Clermont assignment, which called for Counterclaim Defendants to apply for and obtain final approvals for the subdivision proposed by Counterclaim Defendants.

234.    Counterclaim Defendants AACK, Lore and Ackert, Jr., and their partners Ackert, Sr., and Superior, agreed to act as Eiffel's agent in pursuing the necessary approvals for the proposed Clermont subdivision.

235.    As agents, owed Eiffel a fiduciary duty, including a duty of the finest loyalty and honesty and good faith and fair dealing.

236.    In breach of their fiduciary obligations of loyalty, honesty, and good faith and fair dealing, Counterclaim Defendants failed to proceed diligently and in good faith with the subdivision approval process on the Lauren Tice property, but rather proceeded counter to Eiffel's interests and in a way calculated to maximize their ability to obtain monies for sketch approvals quickly from Eiffel rather than meaningfully advance the subdivision approval process.

237.    As a result of its breach of their breach of their fiduciary obligations, Counterclaim Defendants must forfeit their fees for undertaking the obligation to obtain subdivision approvals and are liable and indebted to Eiffel for the fees paid under the Clermont assignment, specifically including the $100,000.00 paid and for the monies paid by Eiffel for costs and expenses.

**SEVENTEENTH COUNTERCLAIM AGAINST**
**AGAINST LORE, ACKERT, Jr. and ACKERT, Sr.**

**(Partnership Liability and Piercing the Corporate Veil)**

238.     Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 to 131 as if fully set forth herein

239.     Lore, Ackert, Jr., Ackert, Sr. and Superior were and are partners or joint venturers in the purported acquisition and development of the Churchland, Lauren Tice and Clermont properties, having each contributed to the partnership and having agreed to share the profits and losses of the partnership.

240.     Lore, Ackert, Jr., Ackert, Sr., and Superior held themselves out as partners in the purported acquisition and development of the Churchland, Lauren Tice and Clermont properties and are therefore partners by estoppel.

241.     As partners or joint venturers, all members of the partnership are liable for the obligations, indebtedness and tortious conduct of the partnership.

242.     The partnership employed four entities in the conduct of its business with respect to the Churchland, Lauren Tice and Clermont properties: namely AACK Land Development LLC, Fairview Block and Supply Corporation, Horizon Real Property Development LLC, and Superior Walls of Hudson Valley, Inc.

243.     The partnership exercised complete domination of the three corporate entities and such domination was used to commit a fraud or wrong against Eiffel which resulted in Eiffel's injury.

244.     The partnership so dominated the three corporate entities, and so ignored their separateness, that the three corporations in effect transacted the partnership's business instead of their own and are but alter egos of the partnership.

245.     Upon information and belief, the three corporate entities and the partnership had

overlapping ownership and officers, commingled assets, lacked indicia of separateness and the corporate entities were undercapitalized.

246. As a result of the foregoing, Eiffel is entitled to judgment piercing the corporate veil and imposing liability on the partners Lore, Ackert, Jr., Ackert, Sr., and Superior for any liabilities of AACK Land Development, Fairview Block and Horizon determined pursuant to the claims of Eiffel against such entities in this suit.

247. Alternatively, Lore, Ackert, Jr., Ackert, Sr., and Superior are partners of AACK, Fairview and Horizon in the Churchland, Lauren Tice, and Clermont developments and assignments are liable for the obligations, indebtedness and tortious conduct of said partners.

### EIGHTEETH COUNTERCLAIM AGAINST
### KIMBERLEY CARPENTER, ESQ.
### (Breach of Escrow Agreement re Three Assignments)

248. Counterclaim-Plaintiff repeats and realleges each and every allegation contained in paragraphs 27 through 131 as if fully set forth herein.

249. Carpenter acted as escrow agent for the Churchland, Lauren Tice and Clermont Assignments.

250. As escrow agent, Carpenter owed a duty to Eiffel to release monies from her escrow only in accord with the strict conditions of the agreement of the parties, her agreement as escrow agent, and only based on accurate certifications.

251. Carpenter breached her duty as an escrow agent by releasing $100,000.00 entrusted to her by Eiffel in connection with the Churchland assignment when she was directed by Eiffel not to release said funds after Eiffel learned of the misrepresentation that the assignor had placed a deposit of $181,200.00 on the underlying contract to purchase the Churchland property.

252.    Carpenter breached her duty as an escrow agent by releasing $50,000.00 entrusted to her by Eiffel in connection with the Lauren Tice assignment based on Carpenter's false certification that Fairview was in good standing with the Secretary of State of New York, that Lore and Ackert had full power to assign the Lauren Tice contract, and that all parties to the contract were in good standing.

253.    Carpenter breached her duty as an escrow agent by releasing $150,000.00 entrusted to her by Eiffel in connection with the Clermont assignment based on the inaccurate representation and warranty that Horizon had full right to assign the contract and based on Carpenter's false certification that the contract was fully assignable and did not require the seller's permission for assignment and that all parties to the contract were in good standing.

254.    Based on Carpenter's breach the conditions of the escrow agreement and her duties as an escrow agent, Carpenter is liable and indebted to Eiffel for the $300,000.00 she improperly paid out of escrow and Eiffel is entitled to an accounting of the monies received by Carpenter pursuant to the Churchland, Lauren Tice and Clermont Assignments.

## JURY TRIAL DEMANDED

Eiffel hereby demands a trial by jury of all issues so triable.

**WHEREFORE**, Defendants demand judgment dismissing plaintiffs' complaint and Counterclaim-Plaintiff Eiffel Investment Group and Associates LLC demands judgment on its counterclaims as follows:

1)    On its first cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest, attorneys' fees and punitive damages, or, alternatively, for rescission of

the assignment and restitution of all amounts paid, and punitive damages in an amount to be determined at trial;

2)      On its second cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys' and punitive damages, or, alternatively, for rescission of the assignment and restitution of all amounts paid, and punitive damages in an amount to be determined at trial;

3)      On its third cause of action, for damages in an amount in excess of $150,000, plus interest and attorneys' fees and punitive damages, or, alternatively, for rescission of the assignment and restitution of all amounts paid, and punitive damages in an amount to be determined at trial;

4)      On its fourth cause of action, for damages in an amount in excess of $350,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest, attorneys' fees and punitive damages, or, alternatively, for rescission of the assignment and restitution of all amounts paid, and punitive damages in an amount to be determined at trial;

5)      On its fifth cause of action, for damages an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys' fees and costs per the contract and a declaration that assignor did not pursue the approval process as required by the assignment;

6)      On its sixth cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest as provided by law and a declaration that assignor did not pursue the

approval process as required by the assignment;

      7)     On its seventh cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys fees' and punitive damages in an amount to be determined at trial;

      8)     On its eighth cause of action, an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys' fees and costs per the contract and a declaration that assignor did not pursue the approval process as required by the assignment;

      9)     On its ninth cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest as provided by law and a declaration that assignor did not pursue the approval process as required by the assignment;

      10)    On  its tenth cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys fees' and punitive damages in an amount to be determined at trial;

      11)    On its eleventh cause of action, for damages in an amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest as provided by law;

      12)    On its twelfth cause of action, for damages in the amount in excess of $100,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys fees' and punitive damages in an amount to be determined at trial;

13)     On its thirteenth cause of action, for damages in an amount in excess of $150,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys' fees and costs per the contract and a declaration that assignor did not pursue the approval process as required by the assignment;

14)     On its fourteenth cause of action, for damages in an amount in excess of $150,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest as provided by law and a declaration that assignor did not pursue the approval process as required by the assignment;

15)     On its fifteenth cause of action, for damages in an amount in excess of $150,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest as provided by law;

16)     On its sixteenth cause of action, for damages in an amount in excess of $150,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus interest and attorneys fees' and punitive damages in an amount to be determined at trial;

17)     On its seventeenth cause of action, On its twelfth cause of action, an amount in excess of $350,000, plus $32,596 for the costs associated with the attempt to obtain approvals to develop the property, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its counterclaim in an amount to be determined at trial, plus interest as provided by law

18)     On its eighteenth cause of action, $300,000.00, plus the attorneys' fees, costs and expenses Eiffel will incur in furtherance of its counterclaim in an amount to be determined at trial, plus interest as provided by law;

19)    Such other and further relief as this Court may deem just, proper and equitable.

Dated:  New York, New York
        August 5, 2008

**GREGG J. BORRI LAW OFFICES**

By: _____

        Gregg J. Borri (GJB 5971)
        Attorney for Defendants & Counterclaim Plaintiff
        *Marie Pupke & Eiffel Investment Group*
        61 Broadway, Suite 2125
        New York, New York 10006
        (212) 980-8866
        gborri@borrilaw.com

**SWEETAPPLE, BROEKER & VARKAS, PL**
        Attorney for Defendants & Counterclaim Plaintiff
        *Marie Pupke & Eiffel Investment Group*
        150 East Boca Raton Road
        Boca Raton, Florida 33432
        (561) 392-1230